**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MICHAEL REDMAN,
Plaintiff-Appellee,

v.

JOHN D. BRUSH AND COMPANY, d/b/a
Sentry Group, Incorporated,                    No. 95-3215
Defendant-Appellant,

and

VALUE-TIQUE, INCORPORATED,
Defendant.

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Glen M. Williams, Senior District Judge.
(CA-91-207-B)

Argued: December 5, 1996

Decided: April 28, 1997

Before WILKINS and LUTTIG, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Reversed by published opinion. Senior Judge Butzner wrote the opin-
ion, in which Judge Wilkins and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Laura Ellyn Wilson, PENN, STUART, ESKRIDGE &
JONES, Abingdon, Virginia, for Appellant. Terry Gene Kilgore, KIL-

GORE & BAKER, Gate City, Virginia, for Appellee. **ON BRIEF:** D. Gregory Baker, KILGORE & BAKER, Gate City, Virginia, for Appellee.

_____

## OPINION

BUTZNER, Senior Circuit Judge:

In this products liability suit, John D. Brush and Company (Sentry), the manufacturer of Sentry safes, seeks review of a jury award entered in favor of Michael Redman. Redman brought the suit after his coin collection, which was locked inside his Sentry safe, was stolen. At the conclusion of trial, the jury awarded Redman the value of the coin collection based on its finding that the loss resulted from the safe's negligent design. Because the evidence was legally insufficient to establish Sentry's liability for the loss, we reverse.

This is a diversity case and Redman's loss occurred in Virginia. Accordingly, Virginia law controls the substantive legal issues. Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993).

I

Redman purchased a Sentry Supreme Safe, Model #5570, from a retailer, which traded under the name of Value-Tique, after noticing the safe in magazine advertisements. The retailer arranged for Sentry to ship Redman's safe, which was delivered in February 1987. Redman stored his coin collection in the safe. In December 1989, while Redman and his family were away for three days, a burglar broke into Redman's home and stole his coin collection. Upon his return, Redman found that the safe, which had a combination lock, had been forced open. On the floor near the safe were a 12" pry bar, a screw driver, a hammer, and the safe's dial and handle.

In December 1991, Redman filed this action against Sentry and Value-Tique to recover the value of the coin collection. The complaint asserted claims for breach of warranty, negligent failure to warn of a dangerous condition, and negligent design or manufacture.

2

Early on, Value-Tique was dismissed from the suit for lack of personal jurisdiction.

Subsequently, Sentry filed a motion for summary judgment. Ruling on the motion, the district court dismissed the warranty claim because the statute of limitations had elapsed and, alternatively, because Sentry had effectively disclaimed all liability for consequential damages. The court also dismissed the negligent design claim because Redman had not presented any evidence to show that the safe was defective. The court did not, however, dismiss the failure to warn claim.

After several months of pretrial preparation, Sentry filed a second motion for summary judgment. In response, Redman asked the court to reconsider its earlier dismissal of the negligent design claim. Acting on these motions, the court changed two of its previous rulings. First, the court reinstated the design claim because Redman had retained an expert who, Redman said, would testify that the safe was negligently designed. Second, the court dismissed the failure to warn claim, finding that Redman could not sustain the claim under Virginia law because the safe was not a dangerous product. The court also held that Redman's claim was not barred by Virginia's economic loss rule. As a result of these rulings, the district court then held that the case would be tried on the sole issue whether Sentry negligently designed and manufactured the safe. Redman has not appealed any of the orders that adversely affected him.

After the jury returned a verdict in Redman's favor, Sentry renewed its motion for judgment as a matter of law because, in its view, Redman had failed to prove the elements of his claim. The district court denied the motion and entered judgment based on the jury's verdict. See Redman v. Sentry Group, Inc., 907 F. Supp. 180 (W.D.Va. 1995). Sentry appealed.

II

Sentry asserts on appeal that the district court erred in several evidentiary rulings and by denying its motion for judgment as a matter of law. Under Federal Rule of Civil Procedure 50, the moving party is entitled to prevail on a motion for judgment as a matter of law if, after a full hearing, the evidence is legally insufficient to allow a rea-

3

sonable jury to find in favor of the other party. With that standard in mind, we review the district court's denial of such a motion de novo. Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994). We review evidentiary rulings for abuse of discretion.

In order to sustain a products liability claim for negligent design under Virginia law, "the plaintiff must prove that the product contained a defect which rendered it unreasonably dangerous for ordinary or foreseeable use." Alevromagiros, 993 F.2d at 420. Although Virginia law requires manufacturers to make reasonably safe products, it does not require them to adopt the safest conceivable design. Austin v. Clark Equipment Co., 48 F.3d 833, 837 (4th Cir. 1995). Instead, manufacturers are required to design products that meet prevailing safety standards at the time the product is made. Sexton v. Bell Helmets, Inc., 926 F.2d 331, 336-37 (4th Cir. 1991). When deciding whether a product's design meets those standards, a court should consider whether the product fails to satisfy applicable industry standards, applicable government standards, or reasonable consumer expectations. Alevromagiros, 993 F.2d at 420.

III

We turn first to the contested evidentiary rulings. At the outset of the trial, Sentry moved to exclude two of Redman's exhibits. Over Sentry's objection, the district court permitted Redman to introduce a Value-Tique advertisement that appeared in a magazine called Coin World three years after Redman bought his safe. The advertisement described the pictured Sentry safe as "burglar deterrent" and "fire resistant." As justification for introducing the advertisement, Redman claimed that he relied on similar advertisements when he bought his safe. The district court allowed Redman to introduce the advertisement because the safe had been advertised "for burglary purposes."

The advertisement should not have been allowed in evidence. The most obvious problem with the advertisement is that it depicts a different model safe from the one Redman purchased. An even more important difficulty with the admission of the advertisement is that the evidence does not link Sentry to the representation of burglar deterrence that appears in the advertisement. The evidence shows only that Redman ordered the safe from Value-Tique and Sentry

4

shipped the safe direct from the factory. According to the best recollection of its witness, Sentry did not place any advertisements in <u>Coin World</u> in 1986 or 1987. In addition, Redman produced no evidence to show that Sentry authorized Value-Tique to describe a Sentry safe as "burglar deterrent." Later during the trial, Redman testified that no one from Sentry told him the safe was "burglar deterrent," and he admitted that he had not produced any advertisements that Sentry had placed in a coin magazine.

The second exhibit that Sentry's counsel challenged was a copy of the warranty that accompanied the safe. Partially overruling the objection of Sentry's counsel, the district court allowed Redman to introduce a sentence from the warranty for impeachment purposes. The sentence reads: "Your safe is built to protect against fire and petty theft, but if properly installed and used will provide a degree of protection against burglary." The district court admitted the warranty statement for impeachment because, in the words of the district court, Sentry's expert "has said they do not make burglary proof safes."

The trouble with the district court's ruling is simply that the warranty was not contrary to the testimony of Sentry's witness. After explaining the standards of Underwriters Laboratories (UL) for burglar resistance, Sentry's expert testified that Sentry does not make burglar resistant safes and that the safe in question was not designed to meet a UL burglary resistance standard; instead, it met a UL fire resistance standard, and it could not be redesigned to meet a burglar resistance standard. He also testified that the safe offered a degree of burglary protection because it has a lock and bolt work that would require some degree of force to enter for anyone who did not know the combination. His testimony was consistent with the warranty, which described the safe as providing "a degree of protection against burglary." Consequently, the warranty did not impeach Sentry's expert. It simply served to confuse the jury by reminding them that Sentry had given a warranty when, in fact, the district court had dismissed Redman's cause of action on the warranty. Although the district court explained to the jury that the warranty itself was not an issue, the jury's prejudicial confusion was made evident by a question they asked about the meaning of "petty theft," a term mentioned in the warranty. The court responded to the jury's question by explaining that the term was not relevant. Nevertheless, the question and answer

5

suggest that the jury was using the statement in the warranty for more than impeachment purposes, especially since it did not impeach Sentry's expert. The warranty should not have been admitted into evidence, and under the circumstances the district court erred by allowing the introduction of the statement for impeachment purposes.

In addition to the Value-Tique advertisement and the warranty statement, Sentry challenges the admissibility of the expert testimony offered by Redman. Redman called as his expert a metallurgic engineer, who undoubtedly qualified to testify about the properties and characteristics of metal. In preparation for trial, he conducted what he called a failure analysis on the safe. Through this analysis, he learned what materials the safe was made of and how those materials were assembled. He also reached the conclusion that the burglar broke into the safe by prying open the door using the pry bar later found next to the safe. Based on his findings, he opined that, although the safe was fire resistant, it was not burglar deterrent.

The problem with the admissibility of that conclusion is that Redman's expert was not qualified to testify about industry standards. He had never before analyzed a safe, engaged in the manufacture or design of safes, or received any training regarding safes. Even more importantly, he was not personally familiar with the standards and rating systems for fire protection capacity and burglary protection capacity used in the safe industry. He acknowledged that his only knowledge of safes was acquired in preparation for this trial through discussions he had initiated with people who sold, distributed, or repaired safes. In fact, he admitted he used the term "burglar deterrent" only because it appeared in the advertisements placed by Value-Tique.

In order to reach the conclusion that Redman's safe was not "burglar deterrent," the expert relied on the hearsay of store personnel to ascertain the meaning of "burglar deterrent," that is, to ascertain the meaning of what he believed to be an applicable industry standard. Redman did not call those employees as witnesses, nor did he attempt to qualify them as experts.

Federal Rule of Evidence 703 permits the admission of expert opinion testimony even though the expert has relied on evidence that

6

is inadmissible. But the rule has a proviso as important as the rule's statement regarding admissibility. The opinion is admissible only if the expert has relied on information of a kind reasonably relied on by experts in the field. In this case, an expert in the relevant field would be familiar with the design and manufacture of safes and the industry standards regarding safes. There is no proof and no reason to believe that such an expert would rely on conversations with store personnel to identify a standard of burglar protection capacity. Thus, Redman's expert should not have been permitted to rely on the inadmissible hearsay of the store personnel for the purpose of establishing a purported industry standard. See United States v. Trong Cuong, 18 F.3d 1132, 1143-44 (4th Cir. 1994); Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989).

Other than the inadmissible hearsay, Redman's expert presented no evidence of an industry standard for "burglar deterrent" safes. In the absence of an industry standard for burglar deterrence, it would be speculative and misleading for the expert to opine that the safe did not meet that undefined standard. Cf. Alevromagiros , 993 F.2d at 421 (rejecting expert testimony that amounts to mere"subjective opinion" because "[l]ike the Fifth Circuit, we are unprepared to agree that `it is so if an expert says it is so.'" [citation omitted]). Under these circumstances, it was error to permit Redman's expert to testify that the safe was not "burglar deterrent." It was proper, however, to admit the expert's testimony about matters relating to his metallurgic expertise, such as his discussion of how the safe was constructed, the salient properties of the safe's component materials, and how he thinks the burglar forced open the door.

IV

Next we examine whether the remaining evidence was sufficient to show a deviation from applicable industry safety standards. We conclude that it was insufficient.

Redman's expert testified that, in his opinion, the safe fell below the industry standard for "burglar deterrent" safes. As we have discussed, however, he was not qualified to testify about industry standards because his only knowledge of the subject derived from an inappropriate source. Since he was not qualified to testify about

7

industry standards, he also was not qualified to offer an opinion about whether the safe met those standards. For that reason, the competent portions of his testimony do not demonstrate that the safe failed to meet an industry standard.

Sentry offered the testimony of its design engineering manager who is a mechanical engineer with 13 years of design experience in the safe industry. Without objection he was offered as an expert on the design and manufacture of safes. He testified that there are two classifications of safes in the industry--fire resistant and burglar resistant. He further testified that the safe in question is designed primarily for fire protection and that it meets UL standards for two-hour fire resistance. He added that, because the safe is equipped with a locking mechanism, it provides some measure of burglar protection, although it does not meet any specific burglar resistance standard. He also testified that safe construction involves a tradeoff between fire resistance and burglar resistance because the materials that enhance burglar resistance reduce fire resistance. He testified that when he examined the safe, he was not furnished the handle to the locking mechanism. Without the handle, he was unable to say how it was removed, but he believed the handle was removed before the thief broke into the safe by using a pry bar on the door.

The district court concluded that, because Sentry's expert acknowledged that Redman's safe did not qualify for a burglar resistance rating, it fell below industry standards. To reach this conclusion, the court created its own standard. Throughout its opinion, it refers to "burglar deterrent/burglar resistant" safes. See Redman, 907 F. Supp. at 183-84. However, neither expert testified that such a standard exists, and no evidence of such a standard was introduced. The phrase "burglar deterrent" originated in Value-Tique's advertisement, which, as shown in Part III, was inadmissible.

The problem with the court's reasoning is that nothing in the record establishes that industry standards require a so-called "burglary deterrent" safe to qualify for a burglar resistance rating. Although the district court did not recognize a difference between"burglar resistant" safes and "burglar deterrent" safes, Sentry's expert--the only witness qualified to testify about industry standards--was careful to draw that distinction. According to Sentry's expert, the burglar resistance rating

8

system is used by the industry to measure burglar protection capacity. He did not testify about the existence of an industry standard for burglar deterrence. Viewed properly, the testimony of Sentry's expert does not establish that Redman's safe failed to meet an applicable industry standard.

Furthermore, Redman did not offer any evidence to establish that an industry standard required the safe at issue, which was designed to resist fires, to provide a defined level of burglary protection. In fact, he did not even present evidence to show that industry standards require a safe designed to be burglar resistant to qualify for a minimum burglar resistance rating. Neither expert suggested that safes designed for fire resistance are required to carry an industry rating for burglar resistance, nor did they say whether other fire resistant safes on the market provide more burglar protection than the safe in question. In short, the evidence did not establish that the safe fell below any applicable industry standard. Neither party referred to any government standards.

We also note that neither Value-Tique, through its advertising description, nor Redman's expert could create a standard, such as "burglar deterrent," against which Sentry's alleged negligence is to be measured. Applying Virginia law, we have held that a company cannot create a particularized standard to measure negligence in the products liability context. See Hottle v. Beech Aircraft Corp., 47 F.3d 106, 108-10 (4th Cir. 1995).

V

Redman may satisfy his burden of establishing that the safe included an unreasonably dangerous defect if he can show that it deviated from reasonable consumer expectations. This avenue is open to him even though he has failed to prove that the safe did not meet industry or government standards. Alevromagiros , 993 F.2d at 420. Consumer expectations are used to gauge whether a product design is defective because those expectations reveal how society "balances known risks and dangers [inherent in a product design] against the feasibility and practicability of applying any given technology" to enhance product safety. Sexton, 926 F.2d at 337. Requiring manufacturers to meet reasonable consumer expectations ensures that their

9

products are required to meet minimum standards deemed appropriate by society, even when those societal standards demand safer products than government or industry standards. Id. at 336-37. In Virginia, a plaintiff can establish reasonable consumer expectations through "`evidence of actual industry practices, . . . published literature, and from direct evidence of what reasonable purchasers considered defective.'" Alevromagiros, 993 F.2d at 420-21 (quoting Sexton). These types of evidence are probative when they establish what society demands or expects from a product. Sexton, 926 F.2d at 337.

Redman presented no evidence to show that reasonable consumers expect all safes to provide a minimum amount of burglary protection. Instead, he contends that a reasonable consumer would have expected the particular safe he purchased to provide more burglary protection than it did. The reason he offers is that this particular safe was marketed as "burglar-deterrent" and Sentry indicated that it would provide "a degree of protection against burglary."

Redman's argument misses the mark. There is no doubt that the safe did, in fact, provide some degree of burglary protection. The safe was heavy, included a locking mechanism, and appeared secure. These features, by themselves, would deter some burglars. In addition, the fact that the burglars needed to break into the safe by removing the handle and dial, and by using a pry bar, indicates that it provided some measure of burglary protection. Redman was unable to say how long the burglar worked to break into the safe. But the job obviously was not done easily or quickly. In addition to removing the handle and the dial, the evidence showed that the burglar used the pry bar at various places on the safe before hitting upon the five spots that forced the door. The pertinent question then is whether reasonable consumers would consider a "burglar-deterrent" safe defective because it did not provide more burglar protection than Redman's safe.

Redman's evidence did not establish how much burglary protection reasonable consumers would expect from a burglar-deterrent safe. The only evidence he offered on this point was his own testimony. He testified that, based on the advertisement, the warranty statement, and the safe's appearance, he expected more protection than the safe provided. Redman's subjective expectations are insufficient to establish

10

what degree of protection or deterrence society expects from a safe. See Alevromagiros, 993 F.2d at 421.

Furthermore, the evidence disclosed that the industry practice is to manufacture safes that qualify for either a fire resistance or a burglar resistance rating, but not both. The reason, according to the unrebutted testimony of Sentry's expert, is that it is not feasible, practically or economically, to enhance the burglar resistance of safes like Redman's without diminishing their capacity to protect against fire. The safe Redman purchased carried a UL rating for fire resistance. In light of the industry practice, it would be unreasonable for a safe like Redman's, which expressly carried a fire resistance rating, to be considered defective because it did not carry a burglar resistance rating as well. Finally, Redman introduced no published literature revealing consumer expectations.

VI

There is also a problem with Redman's claim for damages. He measures his damages by the value of the stolen coin collection. But this damage is an economic loss that Redman cannot recover in a negligence action.

The evidence disclosed that there is no privity of contract between Redman and Sentry. Moreover, Redman's claim on Sentry's warranty was barred by the statute of limitations and by Sentry's lawful exclusion of recovery for consequential damages. The question then arises whether Redman can recover the loss of his coins by bringing an action in tort to bypass Sentry's exclusion of consequential damages. The answer is that Virginia would not permit circumvention of its warranty law in a case like this one.

In Virginia, the economic loss rule applies in negligence suits. Sensenbrenner v. Rust, Orling, & Neale, Architects, Inc., 236 Va. 419, 423, 374 S.E.2d 55, 57 (1988). According to the rule, a plaintiff who is not in privity of contract with the defendant cannot maintain an action for negligence, such as a product liability suit, based on purely economic losses. See Sensenbrenner, 236 Va. at 422-23, 374 S.E.2d at 56-57. This rule remains in force notwithstanding the statutory abolition of the privity requirement in negligence actions for

11

injury to persons and damage to property. See Va. Code Ann. § 8.01-223. This statute is in derogation of the common law and has no application to claims of economic loss. Sensenbrenner, 236 Va. at 423, 374 S.E.2d at 56-57.

The applicability of the economic loss rule depends on the type of loss suffered by the plaintiff. The Virginia Supreme Court has noted with approval that "most jurisdictions equate economic losses . . . with disappointed economic expectations." Sensenbrenner, 236 Va. at 423, 374 S.E.2d at 57. According to the court, "[t]his is clearly the prevailing rule where damage is claimed because goods purchased fail to meet some standard of quality." 236 Va. at 423, 374 S.E.2d at 57. In other words, an economic loss is a loss that flows from the failure of the product to perform as expected.

Virginia law permits a manufacturer to tailor both the warranty protection offered with a product and the remedies available for breach of warranty. See Va. Code §§ 8.2-316, 8.2-719. As a result, the extent of liability and the remedies available in a warranty action are often quite different from the remedies available in tort. By precluding recovery of economic losses in actions for tort, the economic loss rule preserves the balance of rights and remedies established by warranty law. See Sensenbrenner, 236 Va. at 423, 374 S.E.2d at 57.

Redman argues that the economic loss rule does not preclude tort recovery in this case. In his view, whenever a plaintiff seeks to recover a loss involving physical harm to property other than the product itself, the economic loss rule is inapplicable. Applying this reasoning, he argues that the loss of his coin collection constitutes damage to other property that can be recovered in tort. The essence of Redman's claim is that the safe did not meet his expectations of burglar deterrence and burglary protection.

If the safe did not meet Redman's expectations, his remedy is defined by Sentry's warranty, which the court determined was inapplicable because of the statute of limitations and the exclusion of consequential damages. This analysis is consistent with Virginia Supreme Court precedent. In Sensenbrenner, the court made it clear that the distinction between economic losses and injuries to property is linked

12

to the difference between products liability tort actions and contract or warranty actions:

> The controlling policy consideration underlying tort law is the safety of persons and property--the protection of persons and property from losses resulting from injury. The controlling policy consideration underlying the law of contracts is the protection of expectations bargained for. If that distinction is kept in mind, the damages claimed in a particular case may more readily be classified between claims for injuries to persons or property on one hand and economic losses on the other.

Sensenbrenner, 236 Va. at 425, 374 S.E.2d at 58.

Other courts have reached the same conclusion. For example, when roofing material fails to serve its intended function, damage to the underlying roof and the contents of the building may constitute mere economic loss. Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280 (3d Cir. 1980). In addition, the consequential loss of safeguarded property caused by the failure of an alarm system to function has been held to be purely economic loss. Fireman's Fund American Ins. Co. v. Burns Electronic Security Services, 417 N.E.2d 131 (Ill. 1981) (burglar alarm); Arell's Fine Jewelers, Inc. v. Honeywell, Inc., 566 N.Y.S.2d 505 (N.Y. App. Div. 1991) (burglar alarm); see also Nelson v. Todd, 426 N.W.2d 120 (Iowa 1988) (holding that meat spoilage caused by failure of meat preservative to prevent harm constituted economic loss). In each of these cases, warranty law, not tort law, controlled the plaintiff's rights.

In light of the previous discussion, it is clear that Redman's loss is properly classified as economic. The essence of Redman's claim is that he suffered a loss because the safe did not function at the level he expected. Although his claim is based on harm to property other than the safe itself, his loss arose because the safe did not protect the coin collection from burglars in accordance with his expectations. Under these circumstances, the extent of Sentry's liability for Redman's loss is controlled by Sentry's warranty. Redman is not permitted to circumvent Sentry's warranty simply by alleging a negligence claim.

13

VII

Redman has failed to present evidence demonstrating that the safe violated industry standards, government standards, or reasonable consumer expectations. His claim for damages is legally insufficient because it is an economic loss that cannot be recovered in a tort action based on negligent design.

REVERSED

14