Janet Diane TALLEY, Plaintiff,

v.

DANEK MEDICAL, INC., Defendant.

C.A. No. 3:95CV816.

United States District Court,
E.D. Virginia,
Richmond Division.

May 22, 1998.

Lawrence B. Chandler, Jr., Chandler, Franklin & O'Brien, Charlottesville, VA, Mary Ann Barnes, Martin J. McGetrick, Bradford Manson Young, Chandler, Franklin & O'Bryan, Charlottesville, VA, for Janet Diane Talley, plaintiff.

Robert Armistead Angle, Gary J. Spahn, Bradfute Warwick Davenport, Jr., Mays & Valentine, Richmond, VA, Donald H. Green, Pepper, Hamilton & Scheetz, Washington, DC, Michael G. Mulder, Pepper, Hamilton & Scheetz, Philadelphia, PA, Dabney Jefferson Carr, IV, Mays & Valentine, L.L.P., Richmond, VA, George Lehner, Pepper Hamilton, Washington, DC, for Danek Medical, Inc., defendant.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on Defendant's Motion For Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes the motion. On May 9, 1998, the Court heard argument on the motion. For the reasons which follow, the Court will GRANT Defendant's motion.

### I.

Defendant Danek Medical, Inc. ("Danek") designs, manufactures, and distributes the Danek Dyna–Lok System ("Dyna–Lok Device"), a surgical implant device used to immobilize parts of the human spine in spinal fusion surgery. Plaintiff Janet Diane Talley ("Talley") had a Dyna–Lok Device implanted in her back in 1993 to treat an injury that she had received in a work-related accident. This surgery was the third of four surgeries

performed since Talley injured her back in 1992.

## A. The Surgeries

The first surgery was performed by Dr. Andrea Wynn in August 1992 to remove a small herniated disc that may have been compressing the nerves in Talley's spine. Because her condition failed to improve, Talley was referred to Dr. Hallett H. Mathews, an orthopedic surgeon. In February 1993, Dr. Mathews removed the L4–5 disc from Talley's back and inserted bone graft to promote fusion, but did not insert an internal fixation device such as the Dyna–Lok Device. Despite this surgery and physical therapy, Talley's back condition did not improve. After conducting a myelogram to identify other problems with Talley's spine, Dr. Mathews concluded that additional back surgery would be necessary—this time with an internal fixation device.

Prior to her third operation in October 1993, Talley received and read a pamphlet describing the Dyna–Lok Device. Talley also received, "[g]lanced over," [1] and signed a consent form. Shortly thereafter, Dr. Mathews removed disc material to decompress the L4–5 and L5–S1 area and successfully implanted the Dyna–Lok Device. As with her previous surgeries, Talley was instructed to avoid excessive exercise or movement for several weeks, to wear a back brace when not in bed, and to generally avoid overusing her back so as not to loosen the screws or the internal fixation device.

Sometime after her third surgery, Talley began experiencing increased pain in her back as well as additional pain in other areas. Dr. Mathews concluded that due to "excess motion, or from bad bone quality, ..., or not adhering to the guidelines after surgery," the bone screw interface had loosened and the loose screws had become a possible "pain generator" for Talley. Mathews Dep. at 92. Dr. Mathews accordingly recommended further back surgery to either tighten the screws and reattach the Dyna–Lok Device to the spine or remove the Dyna–Lok Device altogether. Although Talley now claims that she understood the purpose of the surgery to

be to remove the Dyna–Lok Device from her back, the consent form which she signed specifically authorized Dr. Mathews to perform "lumbar exploration of L4–5 with *possible removal of Dyna–Lok (Titanium) fixation* and possible regrafting with iliac crest autograft." Def.'s Ex. I (emphasis added).

In February 1995, Dr. Mathews performed the fourth operation on Talley's back. Finding the Dyna–Lok Device intact but the screws loose, Dr. Mathews attempted to fuse the vertebrae again by grafting more bone fragments and reattaching the Dyna–Lok Device with larger screws. Post-surgery, Talley was again instructed to minimize physical activity and to wear a back brace. Although Talley appeared to be rehabilitating successfully for several months following surgery, she began to experience increased pain in late 1995. Dr. Mathews attributed the pain to overactivity and the development of arachnoiditis, a nerve injury that is not uncommon among patients who have had multiple back surgeries.

Talley has since been examined by other doctors who have offered differing opinions as to the stability of the Dyna–Lok Device and the screws. Although Talley has been advised to have the Dyna–Lok Device removed, she has thus far refused because such surgery cannot be guaranteed to improve her condition. She instead seeks monetary relief in this Court for her injuries.

## B. Dr. Mathews

Dr. Mathews is a board certified orthopedic surgeon with a practice focused almost exclusively on spine surgery. He is an associate professor of orthopedic surgery and neurosurgery at the Medical College of Virginia and he trains resident doctors on the use of internal fixation devices. Prior to Talley's surgery in October 1993, Dr. Mathews had performed approximately 400 spine surgeries with internal fixation devices. Since Talley's surgery, Dr. Mathews has continued to use the Dyna–Lok Device in spinal fusion surgeries.

---

1. Talley Dep. at 67.

In addition to his practice and teaching duties, Dr. Mathews is also a consultant to Danek. Since 1991, Dr. Mathews has received substantial monetary compensation[2] from Danek for designing endoscopes and for assisting in efforts to secure FDA approval for the use of endoscopes in the spine—work that involves minimally invasive surgery and that which is completely unrelated to the use of internal fixation devices. *See* Mathews Dep. at 120. Pursuant to the same consulting agreement, Dr. Mathews' office has also acted as a "receptorship site where surgeons would come in and learn surgical techniques from us that involved both Danek products and other products." Mathews Dep. at 135.

Despite this affiliation with Danek, Dr. Mathews has also used internal fixation systems other than the Dyna–Lok Device. *See* Mathews Dep. at 16. According to Dr. Mathews, determining which system to use depends on the individual patient—specifically, "the length of the fusion, the angulation of the spine, or what kind of balance you have to restore. There are many different factors of which system you use." *Id.* at 16–17. Dr. Mathews does, however, concede that he prefers the Dyna–Lok System because it is "user-friendly", "one of the cheapest systems out there cost wise", "predictable", and "easy to teach". *Id.*

## II.

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Summary judgment is appropriate only when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir.1991). The moving party has the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satis-

fied its burden, the Court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir.1987).

Once the movant has met this burden, and a properly supported motion is before the Court, the non-moving party must set forth specific facts showing that there is a genuine issue for trial in order to defeat the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Allstate*, 934 F.2d at 58. Summary judgment is proper if, based on the evidence, "a reasonable jury could [not] return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Allstate*, 934 F.2d at 58. Summary judgment is not proper, however, where the parties have not been afforded the opportunity to conduct adequate discovery. *See Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 961 (4th Cir.1996) ("Summary judgment must be refused where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.") (citation omitted).

## III.

In this products liability action, Talley has sued Danek on the following legal theories: (1) breach of express and implied warranties, (2) negligence, and (3) fraud. Talley argues that Danek has not specifically moved for summary judgment on her claims of fraud and breach of implied warranty. However, Danek's Motion For Summary Judgment clearly seeks "summary judgment on the claims raised in Plaintiff's Complaint." The Court will therefore address the entire Complaint.

### A. Breach of Implied Warranty and Fraud

Danek contends that it is shielded from liability as to Talley's claims for breach of

---

**2.** In addition to receiving an annual consulting fee, travel budget, and research funds, Dr. Mathews has also received 25,000 shares of stock (now 50,000 shares after a stock split) in Danek Group, Inc., a company closely affiliated with Danek. *See* Mathews Dep. at 159–160.

implied warranty (failure to warn) and fraud because: (1) it provided adequate warnings for the Dyna–Lok Device, and (2) Talley was treated by a "learned intermediary"[3] who was aware of the risks associated with the Dyna–Lok Device. Talley argues, however, that evidence of Dr. Mathews' financial arrangement with Danek seriously calls into question whether he lacked "the independent professional judgment" that is purportedly required before the Learned Intermediary Doctrine applies.

■ Under the Learned Intermediary Doctrine, manufacturers of prescription medical products have a duty only to warn physicians, rather than patients, of the risks associated with the use of the product. *See Stanback v. Parke, Davis & Co.*, 657 F.2d 642 (4th Cir.1981); *Pfizer, Inc. v. Jones*, 221 Va. 681, 684, 272 S.E.2d 43 (1980). As spinal fixation devices are "available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." *See Rosci v. AcroMed, Inc.*, 447 Pa.Super. 403, 422, 669 A.2d 959 (1995)(bone screw case).

■ Thus, when adequate information is provided to the physician, the manufacturer will not be held liable despite the physician's failure to give notice to the patient. *See Stanback*, 657 F.2d at 645. Such information may be provided to the physician through the manufacturer's package insert. *See Barnette v. E.R. Squibb & Sons. Inc.*, 670 F.Supp. 650, 651 (E.D.Va.1987). Even if the manufacturer provides inadequate information, however, the manufacturer will not be liable if the plaintiff's physician independently knew of the risks and failed to advise the plaintiff. *See Stanback*, 657 F.2d at 645. Hence, a plaintiff must not only show that a manufacturer's warning was inadequate, but that such inadequacy affected the prescribing physician's use of the product and thereby injured the plaintiff. *See id.* at 645–46.

■ In the instant case, Talley does not contend that Danek's package insert was in-

adequate to warn of the medical risks and complications associated with use of the Dyna–Lok Device. Talley also does not assert that Dr. Mathews was unaware of the risks associated with the use of the Dyna–Lok Device. The package insert and Dr. Mathews' own deposition testimony would clearly refute any such arguments. *See* Def.'s Ex. B(4); Def.'s Ex. C at 27–31. Talley does argue, however, that Dr. Mathews' consulting relationship with Danek affected his "independent professional judgment", thereby rendering the Learned Intermediary Doctrine inapplicable in her case.

■ A review of existing case law does not support Talley's argument. The Learned Intermediary Doctrine is specifically limited to the manufacturer's duty to provide an adequate warning to the treating physician. Neither the Virginia cases applying the doctrine nor the authority cited by Talley require that there be a showing that the manufacturer also establish that the physician's judgment be "independent." Furthermore, as correctly noted by Danek, it is the physician's duty to the patient, as dictated by medical ethics and practice, to act independently and intervene between the patient and device manufacturer. *See Hill v. Searle Labs.*, 884 F.2d 1064, 1070 (8th Cir. 1989); *Swayze v. McNeil Labs., Inc.*, 807 F.2d 464, 471 (5th Cir.1987). Where, as here, there is an alleged conflict of interest that affects the physician's duty to exercise "independent professional judgment" on the patient's behalf, it is the physician who would be held liable to the patient for any violation of that duty—not the device manufacturer.

As noted previously, it is clear that Danek provided appropriate and adequate warnings. Furthermore, other than sheer conjecture, Talley has provided no evidence that Dr. Mathews' consulting agreement with Danek improperly influenced his decision to use the Dyna–Lok Device. Dr. Mathews himself testified that although he prefers the Dyna–Lok System, he does use other internal fixation systems in spinal fusion surgeries—the choice of which depends on the par-

---

**3.** In the Fourth Circuit, physicians are generally considered "learned intermediaries". *See Stanback v. Parke, Davis & Co.*, 657 F.2d 642 (4th Cir.1981); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227 (4th Cir.1984).

ticular patient. *See* Mathews Dep. at 16–17. Thus, even viewing the evidence in the light most favorable to Talley, the Court finds that Dr. Mathews qualifies as a "learned intermediary" who made an informed and "individualized medical judgment bottomed on a knowledge of both patient and palliative." *Stanback*, 657 F.2d at 644 n. 2. If Dr. Mathews was in fact influenced to use the Dyna–Lok Device because of his financial arrangement with Danek, the more appropriate course would be to pursue a claim against Dr. Mathews.

In any event, the Court finds that the Learned Intermediary Doctrine applies to the instant case, barring Talley's claims for breach of implied warranty (failure to warn) and fraud. Accordingly, the Court will GRANT Danek's Motion For Summary Judgment as to these claims.

## B. *Negligence*[4]

▇▇▇ Danek also asserts that it is entitled to summary judgment on Talley's breach of implied warranty and negligence-based products liability claims, arguing that there is no genuine dispute over whether the Dyna–Lok Device was (1) defective and (2) the cause of Talley's injuries. Because the Court now concludes that there is insufficient evidence as a matter of law to support Talley's product defect allegation, the Court does not reach the question of whether the Dyna–Lok Device caused Talley's injuries.

▇▇▇ "To prevail in a products liability case under Virginia law, the plaintiff must prove that the product contained a defect which rendered it unreasonably dangerous for ordinary or foreseeable use." *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir.1993); *see also Logan v. Montgomery Ward & Co.*, 216 Va. 425, 428, 219 S.E.2d 685 (1975). "When determining whether the plaintiff has satisfied this burden, the Court must keep in mind that a manufacturer is not required to adopt the safest conceivable design. *See Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1177 (4th Cir.1997). Rather, a manufacturer is only required to design products that meet prevailing safety standards at the time the product is made. *See id.* at 1177–78 (citation omitted). "When deciding whether a product's design meets those standards, a court should consider whether the product fails to satisfy applicable industry standards, applicable government standards, or reasonable consumer expectations." *Id.* at 1178 (citing *Alevromagiros*, 993 F.2d at 420). A product can be considered defective only when it is "measured against concrete standards and expectations, and falls short of these criteria." *Mears v. General Motors Corp.*, 896 F.Supp. 548, 553 (E.D.Va.1995). Although the issue of defective design is generally left for the jury, the defendant is entitled to judgment as a matter of law if the plaintiff fails to show a violation of a prevailing safety standard. *See, e.g., Redman*, 111 F.3d at 1183; *Alevromagiros*, 993 F.2d at 421.

▇▇▇ To establish product defect in the instant case, Talley offers the testimony of

---

4. Talley also argues that Danek illegally promoted the Dyna–Lok Device for use in the pedicles of the spine in violation of the federal Food, Drug, and Cosmetic Act ("FDCA") and thus, is *negligent per se* under Virginia law. In Virginia, "violation of a statute or ordinance constitutes negligence *per se* " so long as "the injured person is a member of a class for whose benefit the legislation was enacted." *Butler v. Frieden*, 208 Va. 352, 353, 158 S.E.2d 121 (1967).

Talley's sole support for this argument is the report of Dr. Carl A. Larson, Ph.D., who formerly worked for the Food and Drug Administration ("FDA"). *See* Pl.'s Resp. Ex. F. Upon thorough review, however, the Court finds that the report is clearly insufficient to create a genuine dispute on the question of *negligence per se.* Dr. Larson's entire report consists of general and con-

clusory allegations regarding the practices of pedicle screw manufacturers in general. At no point does Dr. Larson mention Danek by name, specify any conduct by Danek that purportedly violated the FDCA, or provide any evidence that Danek was either involved in the promotion of bone screws for use in the pedicles of the spine or failed to comply with FDA promotion and labeling requirements.

Moreover, the FDCA expressly prohibits the bringing of a private cause of action under the Act. *See* 21 U.S.C. § 337(a). To allow a state *negligence per se* action based upon alleged violations of the FDCA would defeat the purpose of that prohibition. Accordingly, the Court finds that Danek is entitled to summary judgment on Talley's FDCA-based *negligence per se* claim.

Dr. Harold Alexander, Ph.D.,[5] an expert in the field of orthopedic bioengineering, and Dr. Franklyn S. O'Rourke, M.D., a board certified orthopedic surgery. Even viewing the evidence in the light most favorable to Talley, however, neither expert has cited any safety standard that the Dyna–Lok Device purportedly violates. In fact, some of Talley's own experts have testified that attaching internal fixation devices to the pedicles of the spine via bone screws is widespread in the medical community and not below the standard of care. *See* Def.'s Mot.Ex. R at 1–2 (Alexander Report); Cherrick Dep. at 25, 35.[6]

Moreover, none of Talley's experts have been able to identify any defect in the design of the Dyna–Lok Device. Dr. Alexander simply opines that there is considerable dispute over whether the use of an internal fixation device in spinal fusion surgery provides any tangible benefit over surgery without such a device. As Talley concedes, this information, standing alone, "is not proof that the instrumentation was unreasonably dangerous. However, the increased risks that accompanied the use of the instrumentation do show a genuine dispute on the issue of unreasonable danger." Pl.'s Resp. at 17. Given Judge Bechtle's ruling that Dr. Alexander is not qualified to offer opinions regarding clinical complications of pedicle fixation, however, Dr. Alexander's opinions on this issue are immaterial. Thus, Dr. Alexander's report does not raise a genuine issue of material fact with respect to Talley's claim that the Dyna–Lok Device contained a design defect.

The report and deposition testimony of Dr. O'Rourke also do not establish that the Dyna–Lok Device contained a design defect. Dr. O'Rourke has opined that (1) a properly-designed internal fixation device should not loosen under the rigor of normal, day-to-day activities and exercise; (2) the screws used in Talley's surgeries were not designed to be implanted in the pedicles of the spine; and (3) the thread depth of those same screws were not deep enough. In support of these opinions, however, Dr. O'Rourke has offered no "evidence such as test data or relevant literature in the field." *Alevromagiros,* 993 F.2d at 422. In fact, Dr. O'Rourke concedes that (1) he is only vaguely familiar with the Dyna–Lok Device, has never used it, and has no knowledge of the warnings or instructions provided with it; (2) there are certain cases in which pedicle screws could and should be used, including "where it provides an advantage over the hooks and rods, or other systems"[7]; and (3) he did not examine the thread depth of the screws that were available to Dr. Mathews when he performed Talley's surgeries nor did he review any literature related to the thread depth or engineering of the threads on the screws used in Talley's surgeries. *See* O'Rourke Dep. at 12, 14, 16; Pl.'s Resp.Ex. C. at 11 (O'Rourke Report); O'Rourke Dep. at 131. Without more, Dr. O'Rourke's statements amount to nothing more than subjective opinions which are clearly insufficient to withstand a motion for summary judgment. *See Alevromagiros,* 993 F.2d at 421 (holding that an expert's own subjective opinion is insufficient to defeat summary judgment).

Because Talley has failed to come forth with admissible evidence which would permit a jury to conclude that the Dyna–Lok Device was defectively designed, the Court finds that Danek's Motion For Summary Judgment must be granted.

---

5. Dr. Alexander's report was first presented in the MDL proceeding where Judge Bechtle ruled that "Dr. Alexander's background and experience qualify him to testify on matters concerning orthopedic bioengineering and its related disciplines, which in this case generally means how pedicle screws function in the human body and how the human body functionally, but not medically, responds to pedicle screws." *In re Orthopedic Bone Screw Products Liability Litigation,* 1997 WL 39583 *3 (E.D.Pa.1997). Judge Bechtle also ruled, however, that Dr. Alexander was not qualified to render opinions on "issues relat-

ing to the Food and Drug Administration's [ ] regulations, products liability law, conflicts of interest, and clinical complications of pedicle fixation." *Id.* at *2.

6. Dr. Abraham A. Cherrick, M.D., is a physician who specializes in physical medicine and rehabilitation. He is not an orthopedic surgeon or neurosurgeon. *See* Cherrick Dep. at 17–18.

7. Pl.'s Resp.Ex. C at 11 (O'Rourke Report).

### C. *Breach of Express Warranty*

 As a final matter, Danek argues that Talley's breach of express warranty claim must fail because there is no evidence that Danek extended any such warranty to Talley. In response, Talley asserts that due to his consulting agreement with Danek, Dr. Mathews should be treated as an agent for Danek and thus, any statements he made or information he provided should be attributed to Danek.[8]

Having previously rejected Talley's argument that Dr. Mathews does not qualify as a "learned intermediary" due to his consulting relationship with Danek, the Court also rejects Talley's argument that Dr. Mathews should be treated as an agent for Danek by virtue of that same relationship. As noted by Danek in its Reply, "there is absolutely no evidence in this record of any actual or apparent agency relationship between Danek and Dr. Mathews regarding the sale or promotion of the Device." Def.'s Reply at 16. Thus, any statements allegedly made by Dr. Mathews to Talley regarding the Dyna–Lok Device cannot be attributed to Danek. Similarly, any information provided by Dr. Mathews' office cannot be imputed to Danek as "[an] affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain"[9] absent a showing that Danek itself provided that information.[10]

Based on the foregoing, the Court finds that Talley has failed to establish that a genuine dispute exists over whether Danek expressly warranted to Talley that the Dyna–Lok Device would stabilize her spine. Accordingly, the Court will GRANT summary judgment as to this claim as well.

### IV.

Talley has failed to set forth specific facts showing that there is a genuine issue for trial in order to defeat Danek's Motion For Summary Judgment. Accordingly, the Court will GRANT summary judgment as a matter of law on all counts of the Complaint.

---

**8.** Specifically, Talley claims that (1) Dr. Mathews stated that "the instrumentation would stabilize her spine"; and (2) Dr. Mathews' office provided Talley with a printed pamphlet which stated that the instrumentation would "stabilize the spine." *See* Pl.'s Resp. at 28–29.

**9.** Va.Code Ann. § 8.2–313(1)(a).

**10.** With respect to the pamphlet, Talley admitted that she did not know who printed the pamphlet, whether Danek printed it, or whether the pamphlet contained any warranty language that she subsequently relied upon. *See* Talley Dep. at 64–65.