**John DOE and Jane Doe, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**IRVINE SCIENTIFIC SALES COMPANY, INC. and Baxter Healthcare Corporation, Defendants.**

**No. CIV. A. 2:97CV1167.**

United States District Court,
E.D. Virginia,
Norfolk Division.

June 8, 1998.

Michael F. Imprevento, Jeffrey Arnold Breit, John Loring Watts, Breit, Drescher & Breit, Norfolk, VA, for Plaintiffs.

J. Tracy Walker, IV, Michael W. Smith, James Edward Moore, Christian, Barton, Epps, Brent & Chappell, Richmond, VA, John Bond Atkinson, Lori A. Brown, Rumberger, Kirk & Caldwell, PA, Miami, FL, Kenneth Carrington Bass, III, Christine Michele McAnney, Venable, Baetjer and Howard, McLean, VA, for Defendants.

## OPINION AND ORDER

CLARKE, District Judge.

This matter is presently before the Court on Defendants', Irvine Scientific Sales Company, Inc.'s and Baxter Healthcare Corporation's, Motions to Dismiss pursuant to Fed. R.Civ.P. 12(b)(6), and Plaintiffs', John and Jane Doe's, Motion for a Protective Order. For the following reasons, the Court **GRANTS** the Defendants' motions and **DENIES** the Plaintiffs' motion.

### I.

All of the following facts are taken from the Plaintiffs' First Amended Complaint. Plaintiffs John and Jane Doe (pseudonyms), bring this class action and allege that during in-vitro fertilization procedures, they have been exposed to, or have had their sperm, eggs, embryos, or other reproductive tissues exposed to certain lots of the product Human Albumin. This blood-derived product was manufactured by Defendant Baxter Healthcare Corporation, and sold and distributed by Defendant Irvine Scientific Sales Company, Inc. Plaintiffs are Florida residents and bring this suit pursuant to the Court's diversity jurisdiction which is uncontested. *See* 28 U.S.C.A. § 1332 (West 1993 and West Supp. 1997).

In December 1996, the United States Food and Drug Administration ("FDA") issued a memorandum recommending that all blood products or their derivatives intended for transfusion or injectable use should be retrieved and destroyed where a donor is diagnosed with CJD or is at increased risk for CJD.

On January 15, 1997, Baxter transmitted a letter captioned "IMPORTANT DRUG WITHDRAWAL INFORMATION" to some of its customers, including Irvine, announcing

the immediate withdrawal of certain lots of Human Albumin. Baxter's action was prompted by the discovery that two donors to the pool of plasma from which the lots were processed, were considered at risk for CJD as a result of post-donation information.

In early February 1997, the Does underwent in-vitro fertilization treatment at the Jones Institute for Women's Health ("the Jones Institute"). Several eggs of an anonymous donor were fertilized in-vitro with sperm donated by John Doe. Three of the resulting embryos were transferred to the uterine cavity of Jane Doe and the remaining embryos were cryopreserved. The Human Albumin was used to store the sperm, eggs, and embryos during this process. As a result, the Does allege that the sperm, eggs, embryos and Jane Doe were all exposed to the Human Albumin subject to the withdrawal and potentially contaminated with CJD.

On February 27, 1997, Irvine transmitted a "Product Withdrawal Notice" to some of its customers, including the Jones Institute, informing them of Baxter's withdrawal of the Albumin, and advising that they "immediately discontinue its use."

On March 14, 1997, the Does learned that the embryo transfer did not result in a pregnancy and that they would have to transfer the remaining cryopreserved embryos. As a result of their exposure to the potentially contaminated Albumin, the cryopreserved embryos were rendered not suitable for implantation.

The Does claim that Defendants knew, or should have known that certain lots of Human Albumin were potentially contaminated by Creutzfeldt–Jakob Disease ("CJD"), which can cause a fatal neurological disorder in humans. It is the human equivalent of Bovine Spongiform Encephalopathy, commonly known as "Mad Cow Disease." Science has not identified with certainty the infectious agent that causes CJD, however, experiments indicate that the agent of CJD may be transmittable by blood.

The Does allege that Defendants were negligent in their recall and withdrawal of the potentially contaminated Albumin from the market, and that such lots were used in connection with in-vitro fertilization and other assisted reproductive technology ("ART") procedures. Specifically, Plaintiffs allege that Baxter, "[f]ailed to withdraw the albumin, or warn of the dangers, when it first became aware that it might be contaminated with CJD ... [f]ailed to ensure that the distributors of its Albumin product properly and timely cooperated with and performed the withdrawal ... and was otherwise negligent." Pls.' First Am. Compl. ¶ 40. Plaintiffs also allege that Baxter "negligently failed to warn its distributors, consumers and others in the stream of commerce of the dangers of CJD contamination associated with the use of their Albumin." Pls.' First Am. Compl. ¶ 41. As to Irvine, Plaintiffs allege that it "failed to timely initiate and cooperate with Baxter's withdrawal of the Albumin, or warn of the dangers, when it first became aware that it might be contaminated with CJD and that Baxter had initiated a withdrawal based upon FDA recommendations." Pls.' First Am. Compl. ¶ 42.

The Does contend that they would not have consented to the use of the Albumin subject to the withdrawal had they been informed of the possible CJD contamination, and that had the Jones Institute been informed of Baxter's withdrawal of the Albumin, it would not have used the potentially contaminated lots in connection with ART procedures. The Does have never been offered compensation or reimbursement for their expenses associated with the ART procedures involving the Albumin. As a result, they claim that they and the members of the class have sustained and or may sustain personal injuries, property damage, emotional distress, and economic loss as a result of the Defendants' actions. The Does seek monetary relief for compensatory and punitive damages.

The Does filed their Complaint and Motion for a Temporary Ex Parte Protective Order on December 16, 1997. Judge Smith of this court granted the Temporary Order on December 17, 1997. The Does filed their First Amended Complaint on February 12, 1998, adding a claim for intentional infliction of emotional distress.

Baxter filed their Motion to Dismiss on February 17, 1998, and the Does responded on March 2, 1998. Baxter filed their Motion to Dismiss First Amended Complaint on March 9, 1998, and then replied to the Does' response on March 18, 1998.

Irvine filed their Motion to Dismiss Complaint and Motion to Dismiss First Amended Complaint on February 23, 1998. The Does responded on March 13, 1998, and Irvine replied on March 23, 1998.

On May 5, 1998, the Court entered a Consent Order of Dismissal of the Does' claim for intentional infliction of emotional distress with prejudice.

Concerning the Does' Motion for Protective Order, Irvine responded on March 2, 1998. The Does replied on March 11, 1998, and on March 18, 1998, they submitted an affidavit in support of their reply. These three filings remain under seal with the Court.

On May 7, 1998, the Court heard oral argument on Defendants' Motions to Dismiss and Plaintiffs' Motion for a Protective Order. Immediately after the hearing, counsel for the Does requested an opportunity to file a brief on the issue of the economic loss rule because Irvine raised the issue in its reply brief and on rebuttal at oral argument. Consequently, the Does had not had the opportunity to respond on this issue. The Court entered an Order permitting all parties to brief, within ten days, the economic loss rule issue. No reply briefs were allowed.

The Court has now received briefs on this issue from Irvine on May 15, 1998, and from the Does on May 19, 1998.

Consequently, the matter is now ripe for adjudication.

## II.

On a motion to dismiss, "[t]he federal rules simply require that a complaint include 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Comet Enterprises Ltd. v. Air–A–Plane Corp.*, 128 F.3d 855, 860 (4th Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court must accept as true the factual allegations in the complaint and must construe them in the light most favorable to the plaintiff. *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 139 (4th Cir.1996); *Martin Marietta v. Intern. Tel. Satellite*, 991 F.2d 94, 97 (4th Cir.1992). A Court should not dismiss a complaint for failure to state a claim, "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Comet Enterprises Ltd.*, 128 F.3d at 860; *Conley*, 355 U.S. at 46, 78 S.Ct. 99.

## III.

### A.

■ With regard to Plaintiffs' claims against Defendants for negligent infliction of emotional distress, the Virginia general rule states that emotional distress damages are not recoverable unless they result directly from tortiously caused physical injury. *Naccash v. Burger*, 223 Va. 406, 415, 290 S.E.2d 825, 830 (1982). Under certain circumstances, the Virginia Supreme Court also recognizes certain "exceptions" to this general rule.[1] In *Naccash*, the Virginia Supreme Court recognized plaintiffs' claims for emotional distress resulting from the "wrongful birth" of their child born with Tay–Sachs disease. The Court found that the hospital owed plaintiffs the duty of reasonable care in the handling of blood withdrawn from the father for the test, and that there was a breach of duty due to negligence in the mislabeling of the father's blood. *Id.*, 223 Va. at 414, 290 S.E.2d at 829. In this case there was a causal connection between the breach of duty by the hospital, and the decision of the parents to continue the pregnancy rather than to abort the fetus, as well as a direct

---

1. These so called "exceptions" are cases where the plaintiff claiming damages for emotional distress does not personally suffer a physical injury. Instead, the plaintiff's family member suffers a physical injury, and as a result causes plaintiff emotional distress. Physical injuries are thus present in these cases, but they are suffered by persons other than the plaintiff claiming damages for emotional distress.

injury due to the deprivation of the parents' opportunity to accept or reject continuance of the mother's pregnancy; the birth of their baby infected with the fatal Tay–Sachs disease and the child's death at age two. *Id.,* 223 Va. at 416, 290 S.E.2d at 831.

The Virginia Supreme Court held that the parents were entitled to damages for their emotional distress. "The evidence showed an unbroken chain of causal connection directly linking the erroneous Tay–Sachs report, the deprivation of the parents' opportunity to accept or reject the continuance of [the plaintiff mother's] pregnancy, and the emotional distress the parents suffered following the birth of their fatally defective child." *Id.*

■ The instant case can be distinguished from the *Naccash* exception because here, there is no evidence of a legally cognizable physical injury to the Plaintiffs. With all due respect to their situation, it appears to the Court that Plaintiffs can prove no set of facts that would entitle them to relief. Their Complaint does not allege a physical injury from which a claim for emotional distress can be traced.

■ The exposure to contaminated products does not constitute a physical injury or an adequate basis for a claim of emotional distress. *Adams v. Star Enter.,* 51 F.3d 417, 422 (4th Cir.1995). In *Hughes v. Moore,* 214 Va. 27, 197 S.E.2d 214 (1973), the Virginia Supreme Court observed that "where conduct is merely negligent, not willful, wanton, or vindictive, and physical impact is lacking, there can be no recovery for emotional disturbance alone ." *Id.,* 214 Va. at 34, 197 S.E.2d at 219. "Rather, to recover for emotional disturbance, such as the fears and apprehensions claimed, a plaintiff must demonstrate ·by clear and convincing evidence that the emotional disturbance produced a physical injury." *Adams,* 51 F.3d at 423.

The Plaintiffs allege that the eggs provided by a donor, John Doe's sperm, and the resulting embryos were exposed to Albumin potentially contaminated with CJD. As a result of this exposure, the frozen embryos were no longer suitable for implementation, and Plaintiffs must begin the process of finding a donor of eggs and repeating the in-vitro fertilization procedure. Taken as true, these claims provide no evidence of any physical injury to the eggs, sperm, and embryos exposed to the Albumin. There is no evidence in the record that CJD has contaminated any of these three reproductive organisms.

As to Jane Doe, Plaintiffs allege that she suffered physical harm from being implanted with embryos exposed to potentially contaminated Albumin. Plaintiffs maintain that the implantation procedure is invasive, painful, and emotionally draining and necessarily involves some physical injury. However, the implantation procedure is not an injury caused by· Defendants' actions, but is an elective process which Jane Doe chose to undergo for fertility treatment at the Jones Institute. Implantation of embryos into Jane Doe's uterine cavity would subject her to the same physical impact even if Baxter had not supplied the Albumin used in the procedure. Furthermore, there is no evidence in the record that Jane Doe has been exposed to agents carrying CJD, or is infected with the disease. Without any physical injury from which to flow, plaintiffs can not claim emotional distress entitling them to damages.

Lacking a legally cognizable physical injury, Plaintiffs fail to state a claim for negligent infliction of emotional distress against Defendants upon which relief can be granted. Accordingly, Plaintiffs' claim for negligent infliction of emotional distress is dismissed.

### B.

■ The economic loss rule recognizes a distinction between the role of contract law and the role of tort law and seeks to prevent tort claims from swallowing up contract law. *East River S.S. Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Virginia applies the economic loss rule in negligence suits. *Redman v. John D. Brush and Co.,* 111 F.3d 1174, 1182 (4th Cir.1997); *Sensenbrenner v. Rust, Orling, & Neale, Architects, Inc.,* 236 Va. 419, 423, 374 S.E.2d 55, 57 (1988). The rule prevents a plaintiff who·is not in privity of contract with a defendant from maintaining an action for negligence based on purely economic losses. *Redman,* 111 F.3d at 1182;

*See Sensenbrenner,* 236 Va. at 422–23, 374 S.E.2d at 56–57. The statutory abolition of the privity requirement in negligence actions for injury to persons and damage to property stands in derogation of the common law and has no application to claims of economic loss.[2]

■ The type of loss suffered by the plaintiff determines the applicability of the economic loss rule. According to the Virginia Supreme Court, "most jurisdictions equate economic losses … with disappointed economic expectations." *Redman,* 111 F.3d at 1182; *Sensenbrenner,* 236 Va. at 423, 374 S.E.2d at 57. The Virginia Court analyzed the distinction between economic losses and losses for injury to persons or property by considering the policy considerations at the heart of tort and contract law:

> The controlling policy consideration underlying tort law is the safety of persons and property—the protection of persons and property from losses resulting from injury. The controlling policy consideration underlying the law of contracts is the protection of expectations bargained for.

*Sensenbrenner,* 236 Va. at 425, 374 S.E.2d at 58.

In the Fourth Circuit case, *Redman v. John D. Brush and Co.,* 111 F.3d 1174 (4th Cir.1997), the coin collection of the plaintiff, Mr. Redman, was stolen during a burglary from a safe which he had purchased from a retailer. Redman brought a products liability action against the safe manufacturer, alleging that the safe was negligently designed and manufactured. He argued against application of the economic loss rule to his case and claimed that it did not preclude tort recovery. *Id.* at 1182. It was his view that "whenever a plaintiff seeks to recover a loss involving physical harm to property other than the product itself, the economic loss rule is inapplicable." *Id.* Therefore, the loss of his coin collection constituted damage to other property that can be recovered in tort. The essence of Redman's claim was that the safe did not meet his expectations of burglary deterrence and burglary protection. The Fourth Circuit disagreed with Redman's

analysis and found that his losses were properly classified as economic. *Id.* at 1183. "The essence of his claim was that he suffered a loss because the safe did not function at the level he expected." *Id.* Although Redman's claims were based on harm to property other than the safe itself, his loss arose because the safe did not protect the coin collection from burglars in accordance with his expectations. *Id.* Applying the economic loss rule, the Fourth Circuit rejected Redman's negligence claim and precluded him from recovering for his losses in a tort action against the safe's manufacturer. The Court held that the extent of the safe manufacturer's liability for Redman's loss was controlled by the manufacturer's warranty, and could not be circumvented by Redman's pleading of a negligence claim. *Id.*

■ Like Redman, Plaintiffs argue that the economic loss rule does not bar their recovery in tort against Defendants. Plaintiffs have alleged property damage and lost wages resulting in their inability to use the cryopreserved embryos which were exposed to the recalled albumin. They seek recovery in tort and claim that Defendants negligently conducted the withdrawal of the Albumin and negligently failed to warn Plaintiffs of the dangers associated with the Albumin. While Plaintiffs endeavor to characterize this loss as an injury in tort, these embryos are not entitled to the protections granted to persons, *see Roe v. Wade,* 410 U.S. 113, 158, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (concluding that "the word 'person,' as used in the Fourteenth Amendment, does not include the unborn"), and this Court has not recognized any status that would entitle them to special treatment because of their potential of human life. *But cf. Davis v. Davis,* 842 S.W.2d 588, 597 (1992) (stating that preembryos are not either "persons" or "property" and according them status in "an interim category that entitles them to special respect because of their potential for human life"). Hence, the embryos themselves have not suffered an actionable tort and Plaintiffs can not bring such claim on their behalf.

---

**2.** The statute provides that "[i]n cases not provided for in § 8.2–318 where recovery of damages for injury to person, including death, or to property resulting from negligence is sought, lack of privity between the parties shall be no defense." Va. Code Ann. § 8 .01–223 (Michie 1992).

The gist of Plaintiffs claim is that they seek to recover for the loss of their embryos which have been rendered unsafe for implantation as a result of being exposed to the recalled albumin. While this Court recognizes the factual distinction between Plaintiffs' situation and the loss of Redman's coin collection, the Fourth Circuit's reasoning in *Redman* guides this Court's analysis. Like Redman, Plaintiffs seek to recover a loss involving the physical harm to property other than the albumin manufactured by Baxter and distributed by Irvine—their embryos. Their losses arose, however, because the in-vitro procedure was unsuccessful and did not result in a pregnancy for Jane Doe. The goods and services provided by the Jones Institute were unsatisfactory, and the Does' economic expectations have been disappointed. These losses are neither personal nor property injuries, and are appropriately characterized as economic losses.[3] Consequently, the economic loss rule applies to the Does' claims and precludes their claims for recovery from Defendants under a negligence theory. Plaintiffs have not alleged privity with Defendants, and are barred from recovering those losses from them.

Plaintiffs have alleged no facts and can prove no actionable physical harm or property damage resulting from Defendants' actions, therefore they fail to state a valid claim for negligence in tort.[4] For these reasons, the Court dismisses Plaintiffs' claims of negligence against Defendants.

### IV.

Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. Therefore, the Court **FINDS** that plaintiffs have failed to state a claim upon which relief can be granted. Accordingly, this Court **GRANTS** Defendants' motions and **DISMISSES** Plaintiffs' claims of negli-

gence and negligent infliction of emotional distress against the Defendants.

Plaintiffs' Motion for Protective Order is moot given the Court's action taken in this Opinion and Order.

The Clerk is **DIRECTED** to mail a copy of this Opinion and Order to counsel for the Plaintiffs and counsel for the Defendants.

**IT IS SO ORDERED.**

---

3. Without any legally cognizable injury to their persons or property, Virginia Code § 8.01–223 does not apply. Likewise, Plaintiffs can not rely on Virginia Code § 8.2–318 to recover against Defendants.

4. Because Plaintiffs have failed to state a legally cognizable claim for negligence, this Court does not reach the issues of whether Baxter had a

duty to withdraw the Albumin identified as at risk for contamination, or whether Baxter had a duty to warn Plaintiffs' directly of the product's recall. For the same reason, the Court does not analyze the issue of whether Irvine negligently performed a withdrawal of the Albumin. Without any physical injury to Plaintiffs, these issues are not ripe for adjudication.