**Darwin SAVAGE and Laura Savage,**
**his wife, Plaintiffs,**

v.

**DANEK MEDICAL, INC., Defendant.**

No. 95–1339–CIV–T–26A.

United States District Court,
M.D. Florida,
Tampa Division.

Jan. 14, 1999.

Scott Charlton, Clark, Charlton, Martino & Borders, P.A., Tampa, FL, for Darwin Savage, Laura Savage, his wife, plaintiffs.

Edward W. Gerecke, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, for Danek Medical, Inc., defendant.

### *ORDER*

LAZZARA, District J.

Before the Court is Defendant's Motion to Correct Judgment ( Dkt. 39), in which Defendant directs this Court's attention to an error made on page 2 of the opinion filed January

7, 1999. The Motion is well-taken. It is therefore **ORDERED AND ADJUDGED** that the Motion (Dkt. 39) is **GRANTED.** The order of January 7, 1999, shall be amended as follows:

### AMENDED ORDER

Before the Court are Defendant Danek Medical, Inc.'s Motion for Summary Final Judgment (Dkt. 27), the supporting Memorandum of Law (Dkt. 28), Plaintiff's Response (Dkt. 29), and Defendant's Reply (Dkt. 33). After carefully reviewing the entire file, including the pleadings, any appendices, and all exhibits, the Court is inclined to grant summary judgment in favor of Defendant Danek Medical, Inc.

### Procedural/Factual History

In August 1995, Plaintiffs Darwin and Laura Savage, husband and wife, filed this action for damages resulting from the implantation of "internal fixation and pedicle screws" in Darwin Savage's spine. (Dkt.1). Danck allegedly failed to warn Mr. Savage "that the internal fixation device and pedicle screws were experimental and had not been FDA approved for placement in the vertebral pedicles as part of a spinal fixation system." (Dkt. 1 at para. 10). "Pedicles are the bony structures that extend posteriorly (towards the rear of the body) from each vertebrae. The spinal fixation systems at issue in these cases consist of plates or rods which are affixed to the spine by means of bone screws inserted into the pedicles of the spine." (Dkt. 28 at App. 15— *In re Orthopedic Bone Screw Products Liability Litigation,* MDL 1014, 1996 WL 107556 n. 3 *5 (E.D.Pa. Mar.8, 1996)). The screw designed and manufactured by Danek had been cleared by the Food and Drug Administration (FDA) for labeling and marketing for general orthopedic use. They were, nevertheless, implanted in the lumbar pedicles of Mr. Savage's spine.

(Dkt. 28 at App. 11 at paras. 7-8---affidavit of Treharne, the Vice President of Research and Regulatory Affairs for the parent company of Danek).

The complaint requested that the action be transferred to the Eastern District of Pennsylvania as "a potential tag-along action to MDL 1014." This "bone screw" case was transferred and has since been remanded to this Court for disposition.

### Allegations of the Complaint

The two-count complaint seeks recovery solely on behalf of Mr. Savage in count I and solely on behalf of Mrs. Savage in count II. Count I seeks recovery based on theories of negligence and strict liability in the design, manufacture, distribution, promotion and sale of screws of the type used in Mr. Savage's surgery. The complaint alleges that Mr. Savage was never warned that the screws were not approved by the Food and Drug Administration (FDA) for implantation into the vertebrae and were defective and unreasonably dangerous, "subject to misuse and not fit and/or designed for pedicle insertion." The complaint further alleges:

[d]ue to the defective design of Defendant's spinal fixation system utilizing pedicle screws, the screws could not be properly implanted to cause the weight borne by the back to be instead borne by the plates which the screws were to hold in place.[1] ... Defendant knew or should have known that once the screws are implanted into the back, the screws manufactured by Defendant, DANEK MEDICAL, INC., break, migrate and/or become loose within the area of implantation thereby failing to provide support to the plates which are meant to provide support to the vertebrae and cause damage to the back, including impinging on the nerve roots.

---

1. A good explanation of how the implantation works to "provide temporary stability to decrease motion between spinal segments while the bone fusion is knitting together" may be found in *Cali v. Danek,* 24 F.Supp.2d 941 (W.D.Wis.1998) (Dkt. 28 at App. 20 at pgs. 5 and 6). Apparently, physicians routinely use medical devices in ways that are not approved by the FDA or not intended by the manufacturer, and this usage is referred to as "off-label." See cases cited by Defendant: *In re Orthopedic Bone Screw Litigation,* MDL 1014, 1996 WL 107556, at *3 (E.D.Pa. Mar.8, 1996) (Dkt. 28 at App. 15); *Upjohn Co. v. MacMurdo,* 562 So.2d 680 (Fla.1990); *Hanohano v. Uppal,* Case No. 257344, at page 3 (Cal.Super.Ct. Jun. 3, 1997) (Dkt. 28 at App. 29); and *Alvarez v. Smith,* 714 So.2d 652 (Fla. 5th DCA 1998).

Count II seeks damages for Mrs. Savage's loss of consortium.

### Pertinent Facts

Mr. Savage had a history of lower back problems and pain beginning in the late 1960's when he injured his back in the Viet Nam War. (Dkt. 28 at App. 1 at pgs. 18–19—deposition of Mr. Savage). He injured his back again in a car accident in 1977. (Dkt. 28 at App. 1 at pgs 13–15). After Mr. Savage was diagnosed with spondylolisthesis,[2] Dr. Charles Finn performed on July 30, 1992, a laminectomy at L5–S1 and a fusion at L5–S1. (Dkt. 28 at App. 3 and App. 2 at pg. 34—deposition of Dr. Finn). Two weeks after surgery, one of the four screws implanted in Mr. Savage had "backed out a couple of millimeters." (Dkt. 28 at App. 2 at pg. 40). Mr. Savage's pain since the surgery has been more constant, "now it's a cramping, aching pain" rather than "a sharp pain," and he now suffers from incontinence. (Dkt. 28 at App. 1 at pgs 26, 29, 75–76—deposition of Mr. Savage).

Before Mr. Savage underwent the surgery in July 1992, he had a history of obesity, weighing 300 pounds, and he is just over six feet and one inch tall. (Dkt. 28 at App. 2 at pg. 19—deposition of Dr. Finn; Dkt. 28 at App. 7—report of Dr. Yarus). With respect to the pain Mr. Savage experienced before surgery, the report of Plaintiffs' expert Dr. Lance Owen Yarus, a doctor of osteopathy, provides:

> He had multiple admissions to the hospital. He was characterized as having excruciating back pain and numbness in his left leg with radiation down the left leg.

(Dkt. 28 at App. 7). Two weeks after the operation Mr. Savage experienced "no pain in the leg, however, some numbness and burning in his legs." (Dkt. 28 at App. 7). "By September 1992 there was a lot of electroshock in his legs and some pain in his back." (Dkt. 28 at App. 7). Dr. Yarus' report further provides:

> 10/14/92 it was indicated that he was feeling better. He had tightness in his back.

CT scan was recommended. The screw had not changed which was backing out in the sacrum. He had no·pain in his legs as of December 1992. However, he had occasional backache. He was able to flex greater than 90 degrees, extend only 20 degrees. CT scan showed no significant abnormalities. There was mild tenderness in the posterior superior iliac spine region. Six month follow up was recommended. Injection was recommended if the symptomatology persisted. There was occasional pain intermittently and numbness in both legs. There was some pain over the right posterior superior iliac spine. This was injected in January 1993.

July 9, 1993 physical therapy evaluation indicated pain starting after a fall. There was pain which was recurrent since July 1992. Pain was rated as three on a ten scale. It was aggravated by walking, standing, sitting and activity in general. Central problems were noted to be secondary to pain. He was awakened from sleep.

. . . .

In the Screw and Plate Surgery questionnaire, Mr. Savage noted that he was aware that the screws were backing out. He described not being able to drive a car, walk, mow the lawn, do housework or go shopping, have sex, fish, hunt, play computer games, sitting for long periods of time, yard-work. He indicated he was hurting most of the time. This was as of 4/30/94.

. . . .

There were burning sensations in both lower extremities as of 9/26/94 especially the right buttock.

(Dkt. 28 at App 7).

The warnings provided by Danek stated that possible adverse effects included "Early or late loosening of the components" and "Disassembly, bending, loosening of the components or instruments." (Dkt. 28 at App. 11 at para. 9 and Exh. 3—affidavit of Treharne, the Vice President of Research and Regulatory Affairs for the parent company of

---

**2.** Spondylolisthesis is "a defect in the pars interarticularis, and there is an instability created with the vertebrae, where there can be shifting

and movement of the vertebrae, vertebral body." (Dkt. 28 at App. 2 at pg. 16—deposition of Dr. Finn).

Danek). Dr. Finn advised Mr. Savage before surgery that risks of failure of the instrumentation existed, specifically "breakage, pull-out, ... if the implant falls apart, if the screws loosen back out, if the implant disassembles." (Dkt. 28 at App. 2 at pg. 27). Dr. Finn knew that the screws were not approved by the FDA for the use he intended. (Dkt. 28 at App. 2 at pg. 30). Dr. Finn had been using pedicle screw fixation, as well as hooks and wires, since 1989. (Dkt. 28 at App. 2 at pgs. 10–11). In Dr. Finn's opinion, pedicle screw fixation is within the accepted standard of care in the medical-surgical community. (Dkt. 28 at App. 2 at pg. 12). Dr. Yarus set forth the following conclusions in his report:

> It is my opinion to a reasonable degree of medical certainty that the implanted metallic devices contributed to Mr. Savage's increase in symptomatology and inability to function sexually or in his activities of daily living. He had urinary and fecal incontinence which was indicative of a sacral screw misplacement. It is clear that there was backing out of the screw. With the type of procedure performed, it is clear that the pedicle screw fixation is directly and causally related to the impairment and disability that Mr. Savage experienced subsequent to the operative intervention. Irrespective of whether a fusion occurred, the procedure was ill-advised and was not within the standard of care. The Danek plates and screws utilized in my opinion to a reasonable degree of medical certainty directly contributed to this gentleman's ongoing and increased symptomatology that is reflected in the record. The fact that he has EMG and nerve conduction velocity findings of radiculopathy is also indicative of a cause and effect relationship.

### Argument

Defendant argues for summary judgment based on three grounds: 1) any claim for negligence or strict liability related to the design or manufacture of the bone screws fails because there is no evidence of negligence or a defective product; 2) any claim for failure to warn fails because the "learned intermediary doctrine" absolves the manufacturer of liability; and 3) all claims fail because there is no competent evidence of medical causation. Plaintiffs counter 1) that a jury could find Defendant liable for "strict product liability and negligent failure to warn," 2) that Defendant cannot escape liability under the learned intermediary doctrine, and 3) that expert testimony evidences a "causal relationship between the instrument's defectiveness and the injuries in question." Defendant, having briefed the issues well, urges that the Court adopt the result and reasoning in *Baker v. Danek Medical, Inc.*, —— F.Supp.2d ——, 1998 WL 968329, Case nos. GCA 95cv1003 MMP & GCA 95cv10154 MMP (N.D.Fla. Sept. 1, 1998)(Dkt. 28 at App. 18), rather than that in *Bellofatto v. Danek Medical, Inc.*, Case no. 95–8643–CV–Hurley (S.D.Fla. Nov. 15, 1998)(Dkt. 31 at 4). The Court notes that at the time of writing this decision, it is unaware of any binding authority on point from the Eleventh Circuit or any decisions written by other judges of this district.

### Analysis

### Evidence of negligence, defective product, or misrepresentation

■ The thrust of Plaintiffs' contention of negligence and a defective product seems to be based on two premises: 1) one of the screws manufactured and designed by Danek became loose and 2) Mr. Savage has experienced incontinence and a more constant pain after the surgery was performed. These premises may be valid. The conclusion reached by Plaintiffs, however,——that because the screw is loose and because Mr. Savage is incontinent and in pain, the screw is *a fortiori* defective——is a faulty one.

■ A defect must be proven by expert testimony. *See Humphreys v. General Motors Corp.*, 839 F.Supp. 822, 828–29 (N.D.Fla. 1993), *aff'd*, 47 F.3d 430 (11th Cir.1995); *see also Worsham v. A.H.Robins Co.*, 734 F.2d 676, 687 n. 8 (11th Cir.1984) ("expert testimony is often required to establish defective design of a product"). Plaintiffs' expert Dr. Yarus opined in his report that the "Danek plates and screws utilized in my opinion to a reasonable degree of medical certainty directly contributed to this gentleman's ongo-

ing and increasing symptomatology." Assuming as fact that the screw did directly contribute to Mr. Savage's symptoms, this does not mean that *ipso facto* the screw was defective. The screw may have been placed improperly, which is not the evidence before this Court, or the screw may have loosened on its own accord. Dr. Yarus does not indicate anywhere in his report that the screw itself, or any other part of the instrumentation used, was defective. As stated in the language used by Senior District Judge Paul, the report does not offer "a specific description of how the screw[ ] actually caused the injuries alleged in the instant case." *See Baker* at ——, 1998 WL 968329, *6. There is simply no evidence regarding any design or manufacturing defect.[3]

The Court need not reach the issue of causation because Plaintiffs have failed to show any evidence that they can use to prove the screw is defective. *See Baker* at ——, 1998 WL 968329, *5, citing *Cartwright v. Home Depot U.S.A., Inc.*, 936 F.Supp. 900, 906 (M.D.Fla.1996) (plaintiff must do more than show a mere temporal relationship between increased pain and the implantation). Even if they could, there is no evidence relating to the causal relationship between the loose screw and the incontinence and pain. No more than mere conclusions exist.

■ As to any claim for misrepresentation, Plaintiffs have failed to point to any evidence tending to show that Dr. Finn relied on any alleged misrepresentations made by Danek or that Dr. Finn ever heard any misleading statements made by representatives of Danek.

### Learned Intermediary Doctrine

■ Plaintiffs cite two cases in support of their position that Dr. Finn was "not sufficiently 'learned' on the possibility that the instrument would break away from his carefully-positioned placement at the crucial site of [the] injury": *E.R.Squibb and Sons, Inc. v.. Farnes*, 697 So.2d 825, 827 (Fla.1997), and *Adams v. G.D. Searle & Co.*, 576 So.2d 728,

728 (Fla.Dist.Ct.App.), *rev. denied*, 589 So.2d 290 (Fla.1991). Plaintiffs contend that in *Farnes*, "the side effect suffered by the plaintiff had been known to the treating physician." "Plaintiff Savage notes, however, that neither he nor his surgeon 'knew' that the screw of the instrument, upon being surgically implanted in his back, would re-position and float apart from the rest of the device."

Nowhere in *Farnes* can the Court find a reference to Mr. Farnes' treating physician's particular knowledge with respect to Mr. Farnes' development of a recurrence of Guillain–Barre Syndrome, a rare neurological disorder, after receiving a flu shot from his nurse. In fact, the opinion provides that nurse Fox's testimony demonstrated that "she understood the warnings, knew the associated risks, but failed to conduct an adequate inquiry into Farnes' medical history." 697 So.2d at 827. Thus, there is no indication that Farnes' doctor had any greater knowledge with respect to either Farnes' condition or the possibility of having a recurrence of Guillain–Barre Syndrome than Dr. Finn with respect to the possibility of a bone screw loosening. Contrary to Plaintiffs' assertion, which was without any citation to this file, Dr. Finn testified that he did know that a screw could possibly back out. In any event, the *Farnes* court held that the manufacturer's duty to warn ran to the physician as a learned intermediary and not to the patient.

In *Adams*, the issue was whether the adequacy of the manufacturer's warnings associated with the use of the Copper 7 intrauterine device was a question of fact which precluded summary judgment where the patient produced evidence tending to show that the warnings were not accurate, clear, and unambiguous. Even assuming that same issue is before this Court, Plaintiffs have not produced any evidence tending to show the warnings were not accurate, clear, and unambiguous. Moreover, merely arguing that evidence exists that Danek violated

---

**3.** In another case involving a loosened pedicle screw, the district court granted summary judgment for failure of the non-moving party, the plaintiff, to identify any design defect through expert testimony. *See Talley v. Danek Medical, Inc.*, 7 F.Supp.2d 725, 732 (E.D.Va.1998) (expert's opinion amounted to no more than subjective opinion).

all of the five prerequisites to off-label use, without directing the Court's attention to what that evidence may be, is insufficient to withstand entry of summary judgment. Consequently, the Court finds that the learned intermediary doctrine prevails in this particular case to absolve Danek of liability for a failure to warn.

The Court finds that Danek has met its burden of establishing the absence of a genuine issue of fact and that the Savages have not set forth specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, summary final judgment is granted.

It is therefore **ORDERED AND ADJUDGED** as follows:

1. Defendant Danek Medical, Inc.'s Motion for Summary Final Judgment (Dkt.27) is **GRANTED.**

2. The Clerk is directed to close this file.