Edwin ALEXANDER, and
Betty Alexander, his
wife, Plaintiffs,

v.

DANEK MEDICAL, INC., a Tennessee
corporation, Defendant.

No. 96–2455–CIVT26E.

United States District Court,
M.D. Florida,
Tampa Division.

Feb. 25, 1999.

Matthew Steven Mudano, Anzalone, Chadwick, Economou & Mudano, P.A., Tampa, FL, for Edwin Alexander, Betty Alexander, plaintiffs.

Edward W. Gerecke, Edward Kuchinski, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, for Danek Medical, Inc., defendant.

## ORDER

LAZZARA, District Judge.

Before the Court are Defendant's Motion for Summary Judgment (Dkt.24), the supporting memorandum (Dkt.25), Plaintiff's Response *submitted under seal* (Dkt.S–2), and Defendant's Reply (Dkt.32). After carefully reviewing the entire file, including the pleadings, any appendices, and all exhibits, the Court is inclined to grant summary judgment in favor of Defendant Danek Medical, Inc.[1]

### *Procedural/Factual History*

In November 1996, Plaintiffs Edwin and Betty Alexander, husband and wife, filed this action for damages resulting from the surgical placement of the pedicle screw fixation device (device) in Edwin Alexander's spine. (Dkt.1). Defendant manufactured the bone screws used in the spinal surgery in this case. This case was transferred to the Eastern District of Pennsylvania to MDL 1014. This "bone screw"

case has since been remanded to this Court for disposition.

### *Allegations of the Complaint*

The six-count complaint seeks recovery on behalf of Mr. Alexander in the first five counts and on behalf of Mrs. Alexander for loss of consortium in the final count. The complaint generally alleges that Mr. Alexander underwent a surgical procedure on October 29, 1993, specifically "Lumbar laminectomy. Instrumentation of fusion, L3–L5 with left posterior iliac crest bone graft using Texas Scottish Rite Hospital [TSRH] pedicle fixation instrumentation, manufactured by Defendant." The complaint continues:

11. Subsequent to the aforementioned surgery, Plaintiff developed paresthesia on the anterior aspect of the right thigh possibly due to nerve root compression; subsequently became extremely disabled due to his inability to ambulate post operatively.

12. Pedicle screws are not reasonably designed or manufactured to bear a sufficient number of fatigue cycles as would be required for the weight and stresses upon the spine under normal conditions and as such, are defective and unreasonably dangerous for their intended use.

13. Implantation of screws into the vertebral pedicle causes the screws to bear the weight normally borne by the back.

14. Pedicle screws are not designed to be a permanent application.

15. Pedicle screw spinal fixation devices are defective and unreasonably dangerous for the following reasons [Plaintiff lists eleven reasons.]

16. The Defendant placed the pedicle screw fixation device on the market and promoted said device, without the approval of the Food and Drug Administration [FDA] and without conducting

---

1. This Court initially issued this order under seal and directed the parties to show cause on or before March 1, 1999, why this order should not be unsealed. The parties have informed the Court that this order may be unsealed and published.

tests and trials necessary to assure the safety and efficacy of the product.

Following the general allegations, the complaint seeks relief in count I for negligence in the manufacture and design of its pedicle screw fixation device. Count II seeks relief under strict liability, count III under breach of an implied warranty of merchantability, count IV under breach of an implied warranty of fitness for a particular purpose, and count V under fraud in the marketing of the device.

### Pertinent Facts

In 1968 or 1969, Mr. Alexander had a previous L5 though S1 fusion in Connecticut. (Dkt. S–2, App. Vol. 1 at Exh. 8—Report of Plaintiff's Expert, Dr. Lance Owen Yarus). Defendant notes that this spinal fusion was "without instrumentation." (Dkt.25). Mr. Alexander appears to have suffered neck and back pain for quite some time before undergoing the second spinal surgery on October 29, 1993.

According to Plaintiff's expert Dr. Lance Owen Yarus, a doctor of osteopathy, the records of Mr. Alexander's family physician show that he received treatment for chronic neck and back pain from September 1987 through May 24, 1992. (Dkt. S–2, App. Vol. 1 at Exh. 8). Mr. Alexander's "low back pain was felt to be due to facet arthritis precipitated by previous surgical interventions." (Dkt. S–2, App. Vol. 1 at Exh. 8). On December 17, 1991, another doctor evaluated Mr. Alexander based on his "complaints of low back pain with radiation into the posterior gluteal area on the left." (Dkt. S–2, App. Vol. 1 at Exh. 8). Mr. Alexander underwent physical therapy but his complaints continued through March 1992. An evaluation with Dr. Snipes "indicated complaints of left hip pain radiating into the left thigh and left shoulder pain." (Dkt. S–2, App. Vol. 1 at Exh. 8).

Eventually, Mr. Alexander saw Dr. Ziebelman in September 1993. Mr. Alexander had "complaints of back pain and left leg pain and radiating pain into the left leg and right upper extremity." Because the treatment was not working, Dr. Ziebelman recommended surgery. A second opinion was obtained "and myelogram and post myelographic CT were felt to show disc bulge at L2–3 and left-sided bulging at 3–4 and narrowing of the right L4–5 foramen." (Dkt. S–2, App. Vol. 1 at Exh. 8).

When Dr. Ziebelman began operating, it became clear that Mr. Alexander "had a spondylolysis, which is sort of a stress fracture of the bone at the third lumbar vertebra." (Dkt. 24, App. Vol. 1 at Exh. 2 at pg. 20). After undergoing the October 1993 surgery, the "[x-]-rays of 10/29/93 demonstrated evidence of posterior plate in position and screw fixation. The bodies were fused in good alignment." (Dkt. S–2, App. Vol. 1 at Exh. 8). Subsequent to the procedure, there was "dysesthesia[2] in the toes of the right foot and anterior right thigh to the knee." (Dkt. S–2, App. Vol. 1 at Exh. 8). Mr. Alexander was using a walker at this time. On December 6, 1993, the x-rays showed "no signs of loosening" and "good fusion between the vertebra." The pain in his left leg had subsided but there were vague symptoms of right leg symptomatology that were not explained on the clinical examination. (Dkt. S–2, App. Vol. 1 at Exh. 8).

In January 1994, Mr. Alexander was using a cane. "His left leg pain was fine— he had some symptoms in this right leg— and the strength was good." (Dkt. 24, App. Vol. 1 at Exh. 2 at pg. 24). By April 1994, "there was paresthesia in the anterior aspect of the right thigh whereas preoperatively there were left lower extremity symptoms." (Dkt. S–2, App. Vol. 1 at Exh. 8). "There were complaints of right lower extremity pain which was new with occasional low back pain." (Dkt. S–2, App. Vol. 1 at Exh. 8). The pain was worsening by the end of April 1994. (Dkt. S–2, App.

---

**2.** Dysesthesia "describes the numbness and tingling." (Dkt. 24, App. Vol. 1 at Exh. 2 at pg. 23).

Vol. 1 at Exh. 8). Mr. Alexander suffered from urinary urgency, urinary frequency, cervical headache and cervical spondylosis. (Dkt. S–2, App. Vol. 1 at Exh. 8).

Dr. Yarus concluded his report with the following:

> It is my opinion to a reasonable degree of medical certainty that Mr. Alexander's continuing pain and discomfort with radiation to the lower extremities was precipitated and caused by the implantation of the metallic fixation devices used to treat his lumbar spine disease. There are indications in the body of the record that there were further medical problems which were progressive and disabling, all of which in my opinion to a reasonable degree of medical certainty are approximately caused by the implantation of metallic devices utilized to treat Mr. Alexander's lumbar spine condition.

(Dkt. S–2, App. Vol. 1 at Exh. 8). Dr. Yarus admitted in his deposition, however, that the instrumentation served its purpose in providing stability that led to a solid fusion. (Dkt. 24, App. Vol. 1 at Exh. 4 at pg. 19).

Dr. Ziebelman advised his patients before surgery that risks of failure of the instrumentation existed, specifically "[t]hat the fusion may not take, bone graft donor site pain, infection, neurologic injury. That clinically he would not be better, could possibly be worse." (Dkt. 24, App. Vol. 1 at Exh. 2 at pgs. 16–17). Dr. Ziebelman knew of the risk of nerve damage, which Dr. Yarus claims occurred. He also knew of the risk of a poor clinical outcome, thereby leaving the patient worse off, which Dr. Yarus claims happened.

Dr. Ziebelman had been using pedicle screw fixation, as well as hook and wire fixation, since the late 1980's. (Dkt. 24, App. Vol. 1 at Exh. 2 at pg. 8). Dr. Ziebelman thought that the use of pedicle screws was superior to hook and wire fixation for Mr. Alexander because Mr. Alexander needed a laminectomy, which required removal of the spine's lamina thus eliminating the anatomical elements where the hooks would attach. (Dkt. 24, App.

Vol. 1 at Exh. 2 at pgs. 8–9). In Dr. Ziebelman's opinion, pedicle screw fixation has been the accepted standard of care in the medical-surgical community since 1989. (Dkt. 24, App. Vol. 1 at Exh. 2 at pgs. 9–10).

### *Argument*

Defendant argues for summary judgment based on four grounds: 1) the claims for negligence, strict liability, and breach of warranty based on design or manufacturing defect fail because there is no evidence that Danek's products were defective or that Danek was negligent; 2) the failure to warn claims under theories of negligence, strict liability and fraud fail because the "learned intermediary doctrine" absolves the manufacturer of liability; 3) the warranty claims fail for lack of privity between Mr. Alexander and Danek; and 4) all claims fail because there is no admissible evidence of medical causation. Plaintiff counters 1) that the pedicle screw surgery did not alleviate his pain and led to neurological problems and 2) that Defendant intentionally violated the Federal Food, Drug and Cosmetic Act (FDCA), the Medical Device Amendments thereto (MDAs) and FDA regulations to illegally promote and market the TSRH device for use in the pedicles.

### *Analysis*

■ To prove a defective product, a defect must be proven by expert testimony. *See Humphreys v. General Motors Corp.,* 839 F.Supp. 822, 828–29 (N.D.Fla.1993), *aff'd,* 47 F.3d 430 (11th Cir.1995); *see also Worsham v. A.H. Robins Co.,* 734 F.2d 676, 687 n. 8 (11th Cir.1984) ("expert testimony is often required to establish defective design of a product"). Plaintiff's expert Dr. Yarus opined in his report that "Mr. Alexander's continuing pain and discomfort with radiation to the lower extremities was precipitated and caused by the implantation of the metallic fixation devices used to treat his lumber spine disease." He wrote that the "further medical problems which were progressive and disabling" were "caused by the im-

plantation of metallic devices utilized to treat Mr. Alexander's lumbar spine condition." (Dkt. S–2, App. Vol. 1 at Exh. 8).

Assuming as fact that the implantation of the device did directly cause continuing pain and discomfort with radiation to the lower extremities, and further medical problems which were progressive and disabling, this does not mean that *ipso facto* the device was defective. *See Savage v. Danek Medical, Inc.*, 31 F.Supp.2d 980 (M.D.Fla.1999). Dr. Yarus does not indicate anywhere in his report that any part of the device used was defective. The report does not offer a specific description of how the device caused the injuries alleged. There is no evidence regarding any design or manufacturing defect.

As this Court wrote in *Savage*, it need not reach the issue of causation because Plaintiff has failed to show any evidence that he can use to prove the device is defective. *See Baker v. Danek Medical, Inc.*, 35 F.Supp.2d 875 (N.D.Fla.1998) at page 5, citing *Cartwright v. Home Depot U.S.A., Inc.*, 936 F.Supp. 900, 906 (M.D.Fla.1996) (plaintiff must do more than show a mere temporal relationship between increased pain and the implantation). Even if he could, there is no evidence relating to the causal relationship between the implantation of the device and the increased pain. No more than mere conclusions exist. *Treadwell v. Dow–United Techs.*, 970 F.Supp. 974, 983 (M.D.Ala. 1997),[3] does not compel a different result.

As to any claim of fraud or "fraud on the FDA," Plaintiff has failed to point to any evidence tending to show that Dr. Ziebelman relied on any misrepresentations made by Danek or that Dr. Ziebelman ever heard any misleading statements made by representatives of Danek. Dr. Ziebelman testified that if a particular use

of a device was not FDA-cleared, then it was still the surgeon's decision to use it— "And if they weren't FDA approved, then it was up to the surgeon." (Dkt. 24, App. Vol. 1 at Exh. 2 at pg. 29).

The Court finds that the "learned intermediary doctrine" applies in this case to absolve Danek of any liability for a failure to warn. Plaintiff cannot show that the inadequacy of the manufacturer's warning affected Dr. Ziebelman's use of the product. *See Wood v. Danek Medical, Inc.*, Case no. 96C–1022, 1998 WL 665774 (Tenn.Cir.Ct. Jun. 17, 1998), citing *Talley v. Danek Medical, Inc.*, 1998 WL 275696 (E.D.Va. May 22, 1998) (Dkt. 24, App. Vol. 2 at Exhs. 38 and 36).[4]

Danek has met its burden of establishing the absence of a genuine issue of fact and the Alexanders have not set forth specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, summary judgment is granted.

It is therefore **ORDERED AND ADJUDGED** as follows:

1. Defendant Danek Medical, Inc.'s Motion for Summary Judgment (Dkt.24) is **GRANTED.**

2. The Clerk is directed to close this file.

**DONE AND ORDERED.**

---

**3.** *Treadwell* is distinguishable. There, the court had "taken great pains" to explain that the plaintiff's expert and treating physician's "analysis rest[ed] not only with the temporal coincidence but also with plaintiff's proven allergic/hyperactive response to formaldehyde." *Id.* at 983. Plaintiff's argument that

Dr. Yarus' report adds facts to support more than a temporal coincidence is unpersuasive. (Dkt. S–2, Response at pg. 11).

**4.** With respect to the arguments concerning negligence per se, the Court finds Danek's arguments persuasive.