**Amy MINISAN, Plaintiff,**

v.

**DANEK MEDICAL, INC., Defendant.**

**No. 3:96 CV 183 AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 24, 1999.

Danek Group, Inc., an Indiana Corporation, Sofamor S N C, an Indiana Corporation doing business in the United States of America, Sofamor Inc., a Georgia Corporation, defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This cause is before the Court on Defendant's, Danek Medical, Inc. (Danek) Motion for Summary Judgment. Defendant filed its Summary Judgment motion on June 30, 1999. The Court provided Plaintiff with several extensions of time in which to respond. The November 15, 1999 deadline has passed with no further filings by Plaintiff, accordingly, this motion is now ripe for ruling.

## JURISDICTION

This case was originally filed in the St. Joseph County Circuit Court. Defendants filed for removal claiming jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question), the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 and 21 C.F.R. § 800.

## I. BACKGROUND

This case is another of more than two thousand separate products liability actions filed in this country by more than five thousand plaintiffs claiming that defective "pedicle screw fixation devices" which were surgically attached to the pedicles of their spines during spine fusion surgery have caused them to suffer physical injuries. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multi district Litigation (MDL) transferred these cases to the United States District Court for the Eastern District of Pennsylvania for consolidated pretrial proceedings. The MDL court, through Judge Louis C. Bechtle, managed the litigation through extensive procedural matters, including dismissal of the original complaints, the filing of amended omni complaints, discovery, and the resolution of numerous motions. In April 1997, Judge Bechtle issued a thorough opinion in *In re: Orthopedic Bone Screw Products Liability Litigation*, No. MDL 1014, 1997 WL

Richard W. Morgan, Sweeney Pfeifer & Morgan, South Bend, for Amy L. Minisan, plaintiffs.

Mary J. Hoeller, Dina M. Cox, Lewis and Wagner, Indianapolis, for Sofamor–

186325 (E.D.Pa. Apr.16, 1997), *aff'd*, 193 F.3d 781 (3d Cir.1999), detailing the plaintiffs' allegations in the consolidated omni actions, describing the pertinent regulatory framework of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, and its Medical Device Amendments, 21 U.S.C. § 360(a) *et seq.* The pre-trial proceedings have now been completed as respects pleading, discovery, and motions that the transferee court determined could and should be considered in the transferee court. The motions that remain to be considered, when filed in the transferor courts are those that are both case and fact specific as opposed to motions that would affect issues that apply to either substantial numbers of cases or all cases in MDL No. 1014. Accordingly, the MDL court has remanded Minisan's case to this Court. See *In re: Orthopedic Bone Screw Products Liability Litigation*, 1998 WL 411380 (E.D.Pa. June 30 1998).

## A. Medical Device Amendment

Under the Medical Device Amendments ("MDA") to the Federal Food, Drug and Cosmetic Act ("FDCA"), medical devices intended for human use are classified as Class I, II, or III devices. Class I devices are considered to present the least risk to human safety and are subject to "general controls;" Class II devices present more risks to human safety than Class I devices and are subject to special controls; and Class III devices present the most risk to human safety and are subject to "premarket approval," which is designed to provide a "reasonable assurance of . . . safety and effectiveness" for the most dangerous medical devices. *See* 21 U.S.C. §§ 360c(a)(1)(C), 360e(e) and 360i(a). Premarket approval under the MDA requires applicants to submit an application detailing: 1) extensive safety testing data; 2) the contents and operation of the device; 3) a description of methods used to manufacture, process, package, and install the

device; 4) samples of the device; 5) proposed labeling for the device; and 6) all other information requested by the FDCA. 21 U.S.C. § 360e(c)(1). Once the device is approved, the Federal Food and Drug Administration ("FDA") regulations prohibit the device from being manufactured, packaged, stored, labeled, distributed, or advertised in a manner inconsistent with the conditions of approval. 21 C.F.R. § 814.80. The FDA retains the power to monitor the device and withdraw approval if the device becomes unsafe. 21 U.S.C. §§ 360e(e)(1)-(3) and 360(I).

## B. Danek's TSRH Spinal System

Danek's Texas Scottish Rite Hospital (TSRH) Spinal System device consists of screws, hooks, rods, transverse traction devices, connectors and other components which may be customized, for spinal fusion surgery purposes, on a patient-by-patient basis. The TSRH construct, once surgically inserted, is intended to immobilize the diseased portion of the patient's spine by connecting adjacent spinal vertebrae with steel rods or plates. The rods or plates are anchored to the patient's spine by metal screws which are themselves inserted into the spinal pedicles.[1] Bone graft material, often in the form of small chips taken from the patient's hip bone, is then packed between and alongside the TSRH device. If spinal fusion surgery is successful, the grafted bone material eventually fuses together to form a solid bony mass that stabilizes the diseased portion of the spine. Danek initially sought to market the TSRH for fixation in the sacrum, and did not seek clearance from the FDA to market the TSRH screws for use in the pedicles. Because the FDA considered the TSRH screws as being substantially equivalent to another pre-enactment device various of its components were approved in early 1989, for marketing and labeling pursuant to the 510(k) process.[2] The FDA specified, however, that the

---

**1.** Pedicles are the two rearward facing bony arches on either side of the vertebral body that support the lamina. *Burton v. Danek*

*Medical, Inc.*, No. Civ.A.95–5565, 1999 WL 118020 (E.D.Pa. March 1, 1999).

**2.** Under the 510(k) process, the FDA clears a

screws could not be labeled nor promoted for pedicular fixation. (Treharne Aff. Ex. 1.)

In November, 1991 Danek received conditional approval to conduct an IDE trial to obtain clinical data on the safety and efficacy of pedicle fixation using the TSRH system. In January, 1992, the FDA approved the Danek TSRH Variable Angle Sacral Screw for use in the sacrum, ilium, and anterior portions of the spine as a substantially equivalent device. In January, 1995 the FDA cleared the stainless steel TSRH Spinal System to be marketed and labeled for pedicle fixation, only with certain restrictions. (Treharne Aff. Ex. 2.) The notice also asserted that Danek "may not label or in any way promote this device system and the TSRH spinal system, for which it is part of, for pedicular screw attachment to, or fixation of the cervical, thoracic or lumbar vertebral column for intended uses other than severe spondylolisthesis."

### C. Amy Minisan

Plaintiff, Amy Minisan (Minisan) injured her back at work in July of 1992. She was initially diagnosed with a back strain, however, medical follow-up found her suffering from grade 2 spondylolisthesis.[3] From July of 1992 until May of 1993, Minisan tried to relieve her pain through conservative treatment including pain medication, physical therapy and steroid injections. The treatment was unsuccessful. After obtaining several medical opinions, Minisan opted for spinal surgery to fuse her L5 and S1[4] vertebrae.[5] The surgery was performed on May 10, 1993 using Danek's implant device. The screws used in her surgery were marketed, labeled and sold under the January 22, 1992 clearance letter issued by the FDA.[6] (Treharne Aff. Ex. 4.) She received some relief after the surgery and returned to work in August of 1993 only to have her back and leg pain recur. By January 26, 1994 tests revealed that at least two of the screws in the device had broken and Minisan had a second surgery implanting a new device in early May, 1994. She again returned to work and her pain recurred. She was diagnosed with pseudoarthrosis in November of 1995.[7] In August of 1995 it was

product for marketing with particular labeling if it finds that the product is substantially equivalent either to a device on the market before May 28, 1976, or to a device that otherwise is legally on the market. 21 U.S.C. § 360c(i)(1)(A); 21 C.F.R. § 807.81 et seq.

3. Spondylolisthesis is a progressive disease of the lumbar spine and involves the slippage of one vertebra over another. See Dorland's Illustrated Medical Dictionary, 28th ed. (1994).

4. The spine consists of three areas, cervical (C), lumbar (L) and sacral (S). Vertebrae are numbered in descending order. Minisan's injury was in her lower lumbar, upper sacral area.

5. Spinal fusion surgery is a method of placing bone graft material between two mobile segments of the spine to knit them together as one bony unit and eliminate motion between the segments. Fusion surgery can be performed with or without the use of spinal instrumentation for internal fixation. With or without the aid of internal fixation instruments, there is a risk that the fusion will not occur. Internal fixation instruments are used to provide stability to decrease motion between segments of the spine to allow the bone fusion to knit together. They act as an internal splint. If a solid fusion is obtained, the device is no longer providing structural support and can be removed. If a solid fusion is not obtained at some point in time the internal fixation device will fail. Internal fixation devices may be attached with hooks, wires or bone screws. When bone screws are employed they are screwed into the pedicles of a vertebra and connected to rods or plates to stabilize movement between the vertebrae to which they are connected. Smith v. Sofamor, S.N.C., 21 F.Supp.2d 918, 919 (W.D.Wis. 1998).

6. This "clearance" allowed for pedicular fixation only as part of an "investigational device exemption" which required separate approval.

7. "Pseudarthrosis" or "pseudoarthrosis" refers to a failure or lack of fusion. See Cali v. Danek Med., Inc., 24 F.Supp.2d 941, 945 (W.D.Wis.1998); see also Stedman's Medical Dictionary 1449 (26th ed.1995) (defining "pseudarthrosis" as "[a] new, false joint arising at the site of an ununited fracture").

determined that Minisan's sacral screws had broken, however no further surgery was done. On September 24, 1996, Minisan injured her back in an auto accident and subsequently had a third spinal surgery. The procedure and results of that surgery are not involved in this case.

Minisan claims that Danek was negligent in designing, manufacturing, promoting, and providing warnings about the TSRH device and that the negligence proximately caused her continued pain and injury. Danek moves for Summary Judgment asserting that no proof of a product defect and no proof of medical causation exists.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993). *See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 at—(quoting Fed.R.Civ.P. 56). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 at—.[8] Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.' " *Id.* The nonmoving party cannot rest on its pleadings, *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920–21 (7th Cir.1994), *reh'g denied; Hughes v. Joliet Correctional Ctr.,* 931 F.2d 425, 428 (7th Cir.1991), nor may that party rely upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994), *reh'g denied, cert. denied,* 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995); *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991), *reh'g denied,* 1993 WL 518446 (7th Cir.1993). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–55, 106 S.Ct. 2505. Applying these principles the Court addresses Defendant's motion.

## II. DISCUSSION

Count I of Minisan's Complaint alleges a strict liability claim. Count II alleges negligence and failure to warn. Danek asserts it is entitled to summary judgment because 1) there are no genuine issues of fact on the essential element of causation; 2) there are no genuine issues of fact on the essential element of defect; and 3) Minisan's Failure to Warn claim is precluded by the "learned intermediary" doctrine.

8. Indiana law is controlling in this case as all parties were at all relevant times residents of Indiana and the surgeries were performed in Indiana.

### A. Proximate Cause

In order to survive a motion for summary judgment, Minisan must carry the burden of proof that the Defendant's device proximately caused her injuries. Proximate cause is an essential element of, and is determined in the same manner in, both negligence and product liability actions. *Wolfe v. Stork RMS–Protecon, Inc.*, 683 N.E.2d 264 (Ind.Ct.App.1997); *Lucas v. Dorsey Corp.*, 609 N.E.2d 1191 (Ind.Ct. App.1993), *trans. denied*. Proximate cause is established if the injury to the plaintiff is a natural and probable consequence of the defendant's act or omission "which was, or should have been, reasonably foreseen or anticipated in light of attendant circumstances." *Montgomery Ward & Co. v. Gregg*, 554 N.E.2d 1145, 1156 (Ind.Ct.App.1990), *reh'g denied, trans. denied*, (citing *Conder v. Hull Lift Truck, Inc.*, 435 N.E.2d 10, 14 (Ind.1982)). Furthermore, the intervening act or omission of a third party will not operate to defeat recovery from the defendant if the act or omission would necessarily, or might reasonably, have been foreseen by the defendant. *Conder*, 435 N.E.2d at 14 (citing *Shanks v. A.F.E. Industries, Inc.*, 403 N.E.2d 849 (Ind.Ct.App.1980), *rev'd on other grounds*, 275 Ind. 241, 416 N.E.2d 833 (1981)).

Proof of legal causation in a medical device case must be by expert testimony and the expert's opinion must be stated in terms of reasonable probability. *Hartwell v. Danek Medical, Inc.*, 47 F.Supp.2d 703 (W.D.Va.1999); *Alexander v. Danek Medical, Inc.*, 37 F.Supp.2d 1346 (M.D.Fla.1999). However, the degree of certainty with which an expert asserts his opinion is irrelevant if the opinion is unsupported. *Porter v. Whitehall Labs., Inc.*, 791 F.Supp. 1335 (S.D.Ind.1992), *aff'd* 9 F.3d 607 (7th Cir.1993). Furthermore, the proponent of the expert testimony must show by a preponderance of the evidence that the witness is qualified. *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This Court notes that upon remand, the majority of district courts dealing with the MDL Bone Screw cases have found causation lacking.[9] The Plaintiffs' major difficulty in those cases arose from the knowledge, skills and training (or lack thereof) of the proffered expert. *But see, Sita v. Danek Medical, Inc.*, 43 F.Supp.2d 245 (E.D.N.Y.1999) (finding sufficient evidence of causation where plaintiff's pain and evidence of a broken screw were specifically related); *Taylor v. Danek Medical, Inc.*, No. 95–7232, 1998 WL 962062 (E.D.Pa. Dec.29,

---

9. *See Talley v. Danek Medical, Inc.*, 179 F.3d 154 (4th Cir.1999); *Valente v. Sofamor, S.N.C.*, 48 F.Supp.2d 862 (E.D.Wis.1999); *Schmerling v. Danek Medical, Inc.*, No. 96–2749, 1999 WL 712591 (E.D.Pa. Sept.9, 1999); *Lawrence v. Sofamor, S.N.C.*, No. 95–CV–1507, 1999 WL 592689 slip op. (N.D.N.Y. Aug. 2 1999); *Menges v. Depuy Motech, Inc.*, 61 F.Supp.2d 817 (N.D.Ind.1999); *McCollin v. Synthes, Inc.*, 50 F.Supp.2d 1119 (D.Utah 1999); *Wheat v. Sofamor, S.N.C.*, 46 F.Supp.2d 1351 (N.D.Ga.1999); *Hartwell*, 47 F.Supp.2d 703; *McLellan v. Sofamor–Danek Group, Inc.*, No. 95–CV–0322, 1999 WL 222591 (W.D.N.Y. April 12, 1999); *O'Brien v. Sofamar*, No. 96–8015, 1999 WL 239414 (E.D.Pa. Mar. 30.1999); *Pulice v. Smith and Nephew Richards, Inc.*, No. 97–2080, 1999 WL 613370 (W.D.Ark. March 29, 1999); *Cali*, 24 F.Supp.2d 941; *Collins v. Danek Medical, Inc.*, Nos. 95–2829, 95–2542, 1999 WL 628690 (W.D.Tenn. Mar. 23, 1999); *Danford v. Danek Medical, Inc.*, Nos. 95–2690, 95–2542, 1999 WL 613409 slip op. (W.D.Tenn. Mar. 22, 1999); *Cheek v. Danek Medical, Inc.*, No. 69CV995, 1999 WL 613321 (M.D.N.C. Mar. 9, 1999); *Burton v. Danek Medical, Inc.*, No. 95–5565, 1999 WL 118020 (E.D.Pa. Mar.1, 1999), *petition for cert. filed; Coleman v. Danek Medical, Inc.*, 43 F.Supp.2d 637 (S.D.Miss.1999); *Hickman v. Sofamor–Danek Group, Inc.*, No. 95–1095, 1999 WL 606690 (N.D.Cal. Feb. 17, 1999); *Driggers v. Sofamor S.N.C.*, 44 F.Supp.2d 760 (M.D.N.C.1998); *West v. Danek Medical, Inc.*, No. 97–575, 1998 WL 1041327 (W.D.Okla. Dec.28, 1998); *Leigh v. Danek Medical, Inc.*, No. 95–CV–797, 1998 WL 1041329 (W.D.Tex. Dec. 14, 1998); *Conger v. Danek Medical, Inc.*, No. 96 CV 739, 1998 WL 1041331 (N.D.Tex. Dec. 14, 1998); *Love v. Danek Medical, Inc.*, No. 3:95CV–706–S, 1998 WL 1048241 (W.D.Ky. Nov.25, 1998).

1998) (finding sufficient evidence only on the claims of negligent failure to obtain regulatory clearance and negligence *per se* ), *recons. denied* (1999). While courts are not to impose overly rigorous requirements of expertise and must be satisfied with more generalized qualifications, the fact remains that a witness without sufficient knowledge, either through training or experience, may not testify as an expert. *See e.g., Wheat v. Sofamor S.N.C.,* 46 F.Supp.2d 1351 (N.D.Ga.1999) (board certified anesthesiologist who specialized in pain management and had treated patients with spinal instrumentation was not qualified expert); *O'Brien,* 1999 WL 239414, *3 (board certified neurologist with no training or education in instrumented spinal fusion surgery not qualified); *Conger v. Danek Medical, Inc.,* No. 96CV739, 1998 WL 1041331, *5–6 (N.D.Tex. Dec. 14, 1998) (striking expert reports and granting summary judgment where plaintiff's proffered experts had never used spinal fixation devices, were not experts in field of spinal fusion surgery, had never met plaintiff) *Burton v. Danek Medical, Inc.,* No. 95–5565, 1999 WL 118020 (E.D.Pa. March 1, 1999) (holding same), *petition for cert. filed* (May 3, 1999).

■ In this case, Minisan offers the report of Dr. Lance Yarus as her only evidence. Dr. Yarus is an Osteopath (D.O.) with board certification in orthopedic surgery and pain management. His curriculum vita indicates at least some training in spine surgery as well as in general orthopedics. (*See* Def.'s Mem. in Supp., Ex. O) He has staff privileges at several hospitals and his teaching affiliations include orthopedic surgery. His credentials appear sufficient to survive the "qualification" hurdle in a *Daubert* analysis. *See, McCollin,* 50 F.Supp.2d 1119, 1125 (finding Dr. Yarus marginally qualified). However, in addition to sufficient knowledge and training, an expert's testimony must be "reliable." *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. District courts have routinely found causation lacking where experts offered only conclusory opinions, did not address whether other factors might have caused the plaintiff's injuries, and failed to state why or how he came to his conclusions. *See generally, Valente v. Sofamor, S.N.C.,* 48 F.Supp.2d 862 (E.D.Wis.1999) (no competent evidence of causation where plaintiff's expert gave conclusory opinions, failed to identify a defect in the design or manufacture of the device and failed to perform differential diagnosis); *Cali v. Danek Medical, Inc.,* 24 F.Supp.2d 941 (W.D.Wis.1998) (no evidence of causation where experts' testimony was not scientifically reliable); *Coleman v. Danek Medical, Inc.,* 43 F.Supp.2d 637, 650 (S.D.Miss. 1999) (no causation where expert offered only conclusory assertions, failed to identify causal nexus between Danek's product and harm to plaintiff); *Driggers v. Sofamor, S.N.C.,* 44 F.Supp.2d 760, 765 (M.D.N.C.1998) (no competent evidence of causation where expert failed to rule out other causes of plaintiff's pain). It is on this prong that Plaintiff's expert fails. Dr. Yarus states that he arrived at his conclusions based solely on an examination of Minisan's numerous medical records. He apparently never examined her, met with her or even spoke to her. Neither did he examine or test the TSRH device. Dr. Yarus concludes that "both surgical interventions were the proximate cause of the non-unions and subsequent development of pain." (Def.'s Mem. in Supp., Ex. O at 4.) He also concludes that Minisan's continued disability is directly related to the metallic devices. (*Id.*) Under *Daubert,* the expert "must explain precisely how [he] went about reaching [his] conclusions and point to some objective source ... to show that [he] has followed the scientific method..." *Daubert v. Merrell Dow Pharm.,* 43 F.3d 1311, 1317 (9th Cir.1995) (*Daubert II*). Similar to his reports provided in other bone Screw cases, Dr. Yarus has failed to provide any explanation as to how he reached his conclusions. *See McCollin,* 50 F.Supp.2d 1119, 1126–27; *Hartwell,* 47 F.Supp.2d 703, 712–13; *Pulice,* 1999 WL 613370 at * 5–9; *Moses v. Danek Medical, Inc.* No. CV 95–512, 1998 WL 1041279 at

*7 (D.Nev. Dec. 11, 1998). Dr. Yarus has not met the standard set forth in *Daubert.* The court therefore concludes that Dr. Yarus' opinion is simply insufficient to create a material fact issue for trial with respect to the issue of causation. Accordingly, Danek is entitled to summary judgment on both the strict liability and negligence claims because Minisan is unable to establish a causal nexus. Furthermore, even if this Court accepted Dr. Yarus' conclusions, Minisan's claims still fail.

### B. Strict Liability

The doctrine of strict liability, as set forth in Section 402A of the Restatement of Torts (2d) has been adopted as the law in Indiana. *Ayr–Way Stores, Inc. v. Chitwood,* 261 Ind. 86, 300 N.E.2d 335 (1973); *Perfection Paint & Color Co. v. Konduris,* 147 Ind.App. 106, 258 N.E.2d 681 (1970). Section 402A imposes liability upon "(*o*)ne who sells any product in a defective condition unreasonably dangerous to the user . . . ." A product may be defective because of manufacturing flaws, defective design, or failure to discharge a duty to warn or instruct with respect to potential dangers in the use of the product. *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank,* 332 N.E.2d 820 (Ind. App.1975), *rev'd on other grounds; Burton v. L.O. Smith Foundry Prod. Co.,* 529 F.2d 108 (7th Cir.1976). Under the doctrine of strict liability an essential element of proof is that the defective condition of the product causes plaintiff's harm. *Ayr–Way Stores, Inc., supra; Nissen Trampoline Co., supra.*

### 1. Defect

Even if this Court assumes as fact that the fracture of the screws did directly cause continuing pain and discomfort that necessitated further surgery, this does not mean that *ipso facto* the device was defective. *Alexander,* 37 F.Supp.2d 1346, 1349. *See Sita,* 43 F.Supp.2d 245, 257 (fact that screw broke ten months after implantation not itself evidence of defect); *Savage v. Danek Medical, Inc.,* 31 F.Supp.2d 980 (M.D.Fla.1999) (two weeks

after surgery one screw loosened, not evidence of defect). A defect also must be proven by expert testimony. *Savage* at 983; *Wheat,* 46 F.Supp.2d 1351, 1360. Fatal to Minisan's argument is the fact that she made no attempt to rule out any other cause for her pain and alleged injury. Nor has she made a showing from which this court could infer that screws only break when the manufacturer fails to follow FDA regulations or only break when they are defective. *See Kirkman v. Sofamor, S.N.C.,* No. 98CV100, 1998 WL 666706 at *4 (W.D.N.C. July 21, 1998) (screw broke through the pedicle wall but court rejected expert's opinion because he did not rule out other causes and merely claimed this occurred due to defect). A device failure or malfunction will not, without more, render a manufacturer liable. *Harwell v. American Medical Sys., Inc.,* 803 F.Supp. 1287 (M.D.Tenn.1992). It is a known fact in the medical community that bone screws may break due to a number of factors unrelated to any defect. Moreover, even if the court accepted the broken screws as evidence of a defect and construing all facts in a light most favorable to Minisan, her strict liability claim still fails.

### 2. Unreasonably Dangerous

For purposes of strict liability, a defective product must also be unreasonably dangerous. Under § 33–1–1.5–2.5(c), "a product is not defective" if it is "safe for reasonably expectable handling and consumption." If injury results from use "that is not reasonably expectable, the seller is not liable" under the Act. *Natural Gas Odorizing, Inc. v. Downs,* 685 N.E.2d 155 (Ind.Ct.App.1997), *reh'g denied, trans. denied.* Section 402A, Comment i defines the standard:

> " ' . . . The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer . . . . The article sold must be dangerous *to an extent beyond that which would be contemplated by the*

*ordinary consumer* who purchases it, with the ordinary knowledge common to the community as to its characteristics...'"

Restatement of Torts 2d (emphasis added). Prior medical device related litigation has made clear that the fact that a medical device has not been approved by the FDA for a particular use does not mean that the device is unsafe, much less that the device is defective. *Sita,* 43 F.Supp.2d 245, 257. The use of the TSRH instrumentation in this case was what is commonly known as "off-label" use. Such a use by physicians is not prohibited by the FDA. *See Ortho Pharm. Corp. v. Cosprophar, Inc.,* 32 F.3d 690 (2d Cir.1994) (FDA permits doctors to prescribe drugs [and internal fixation devices] for "off-label" uses), *aff'd* 179 F.3d 725 (9th Cir.1999). *See also, In re Bone Screw,* 1996 WL 107556 at *3 (E.D.Pa. 1996); *Sita,* 43 F.Supp.2d 245, 262; *Talley v. Danek,* 7 F.Supp.2d 725 (E.D.Va.1998). Doctors commonly exercise professional medical judgment and prescribe [devices] for uses not within the indications articulated by the FDA. *Weaver v. Reagen,* 886 F.2d 194 (8th Cir.1989), reh'g denied.[10] The majority of testimony in related cases establishes that doctors have been using pedicle screw fixation for years.[11] In addition, the record indicates that the TSRH device was actually granted conditional approval for use in 1992, prior to Minisan's surgery. Whether such a use was proper is not the issue before this Court.[12] Be-

cause no evidence of a defect or evidence that the product was unreasonably unsafe has been produced Minisan's strict liability claim fails.

## C. Failure to Warn

Count II of Minisan's Complaint appears to allege a cause of action for negligence and failure to warn. Failure-to-warn is a theory of recovery that is separate from a claim alleging defective design. *See Gorton v. American Cyanamid Co.,* 194 Wis.2d 203, 533 N.W.2d 746, 754 (1995), *cert. denied* 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 701 (1996). However, under the Learned Intermediary Doctrine, manufacturers of prescription medical products have a duty only to warn physicians, rather than patients, of the risks associated with the use of the product. *See Wheat,* 46 F.Supp.2d 1351, 1362; *Talley,* 7 F.Supp.2d 725, 730. As spinal fixation devices are "available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." *Talley, supra.* Furthermore, even if the manufacturer provides inadequate information, however, the manufacturer will not be liable if the plaintiff's physician independently knew of the risks and failed to advise the plaintiff. *Id.* Hence, a plaintiff must not only show that a manufacturer's warning was inadequate, but that such inadequacy affected the prescribing physician's use of the product and

**10.** The Court notes that recently several Courts have addressed whether a reinstatement of the "Fraud on the FDA" claims previously dismissed by the Multidistrict Litigation Panel is proper. The decisions are split. *See Swain v. Danek Medical, Inc.,* No. CIV. 96–1515 JO, 1999 WL 551127, (D.Or. July 23, 1999); *Dachenhausen v. Danek Medical, Inc.,* NO. CIV. 95–1650–JO, 1999 WL 552658 (D.Or. Jul 23, 1999); *Price v. Danek Medical, Inc.,* NO. CIV 95–1651–JO, 1999 WL 588171 (D.Or. Jul 23, 1999); *In re Orthopedic Bone Screw MDL No. 1014 Products Liability Litigation,* 1999 WL 455667 (E.D.Pa. July 2, 1999) (all allowing reinstatement). *But see, Lawrence v. Sofamor, S.N.C.,* No. 95–CV–1507, 1999 WL 592689 (N.D.N.Y. Aug. 2, 1999) (denying reinstatement); *Clark v. Danek Medi-*

*cal, Inc.,* 64 F.Supp.2d 652 (W.D.Ky.1999) (held that alleged misrepresentations to FDA were not cause of plaintiffs' injuries).

**11.** in *Sita,* the defendants submitted an impressive compendium of surgeon's testimony presenting the opinions of 270 orthopedic spine and neurological surgeons that the use of internal fixation devices, such as the TSRH System was, and still is, the accepted standard of care in that medical community. 43 F.Supp.2d at 255.

**12.** Whether Danek mislead the FDA when applying for testing clearance or mislead the surgeons in some way is also not before this Court.

thereby injured the plaintiff. Minisan has failed to make such a showing in this case. Accordingly, summary judgment is proper.

## CONCLUSION

For the preceding reasons, Defendant Danek Medical's Motion for Summary Judgment is hereby **GRANTED. IT IS SO ORDERED.**